## ROSALIO CASTILLO V. THE STATE.

*No. 7866.   Decided June 25.*

**1. Rape—Declarations of Prosecutrix as Evidence—Res Gestæ.** Over objection of defendant, the State was allowed to prove that the prosecutrix, who was a child not quite eleven years old, in a few minutes after the occurrence told her grandmother, as soon as she arrived at home, the circumstances, and that the man who had ravished her "had a scar on his face." Also, that in about a half hour thereafter the prosecutrix, who was then lying upon a bench, suffering, bleeding, and prostrated, described her assailant to another witness as the man whom "he (witness) saw following behind me with a tin bucket in his hand, and who had a scar on his face." *Held,* that the evidence was competent and admissible as res gestæ.

**2. Same—Under what Circumstances and to what Extent the Declarations are Admissible.**—Where the prosecutrix makes complaint that she has been ravished, that fact may be proved, though the particulars of

her statement can not be proved as original and independent testimony. The identity of the accused as the party committing the crime can not be proved by the declarations of the prosecutrix. But if her veracity be attacked by defendant, then such declarations are legitimate in rebuttal in support of her veracity. These rules, however, do not apply to any statements by the prosecutrix which are res gestæ. When res gestæ, such statements and declarations are original primary evidence, and are legitimate and admissible as such. The distinction is, if res gestæ, the details of the statement are admissible in evidence; if not res gestæ, the particulars of such statement can not be primarily introduced.

3. **Res Gestæ — Declarations, when.** — In order to constitute declarations a part of the res gestæ, it is not necessary that they were precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous and admissible in evidence.

APPEAL from the District Court of El Paso. Tried below before Hon. T. A. FALVEY.

This appeal is from a judgment of conviction for rape, wherein the punishment is assessed at death. All the essential facts in the case will be found contained in the testimony of the prosecutrix and her grandmother, which we reproduce in full.

Luz Romero, for the State, being duly sworn, testified as follows: I know the defendant. (Witness here points him out to the jury.) He is the man who took hold of me when I was coming from Mr. Mayer's, where I had been sent that day on an errand. I had noticed him following me before he overtook me. Before I got opposite Mr. Lyons' house I saw Matias Villareal; he was coming from town, and crossed the path I was in, passing in a few steps of me. After I had passed beyond Mr. Lyons' house about a hundred yards, the defendant caught me and stopped my mouth, and I told him to let me go, and he said no. I then tried to get away from him, but could not; and he then pulled me from the path in some bushes near the side of it, where there is a mesquit bush, sat me in his lap, pulled out his knife, and said if I cried he would kill me. He then handed me the knife and I threw it away. He then threw me down upon the ground, with my face up. Then he pulled out his privates (I don't know the name of that thing), and put it on my privates, and then he put it in my privates. He pènetrated my privates with his private parts, which he pulled out of his pants. I then felt pain in my privates from the penetration; it hurt me very much, and I bled from my privates a good deal. When he got through, he wiped his privates with some paper. I then got up and told him I was going to let my mother know about it. I then went to my grandmother's, where I was staying, and told my grandmother about it. I told her that the man who had wronged me was the man who followed me, and that he was carrying a tin bucket, and had a scar on his face. (Here defendant, by

his counsel, objected to the witness stating anything that she told her grandmother, except the fact that she made complaint of the injury, which objection was overruled by the court, and witness, over said objections, was permitted to testify that the man who followed her with a tin bucket and had a scar on his face was the man who had hurt her; to which ruling of the court the defendant, by his counsel, excepted upon the ground that said testimony was incompetent.)

My privates were very open and swollen after that, and I couldn't make water for four days afterwards, and I feel pain now, and have ever since I was injured, inside my privates. I did not give my consent for the defendant to do what he did to me. He did it by force, and I couldn't help myself. I used all the force I could in resisting him, but he was stronger than I, and I could not keep him from it. I didn't halloo, or cry out, because he kept his hand over my mouth all the time. That evening after I was hurt, Matias Villareal came to my grandmother's, and I told him that the man whom he saw following behind me, who had a tin bucket in his hand, was the man who took me and hurt me; that he had a scar on his face, and he said that he knew him well. (To the question that elicited from the witness what she told Villareal, the defendant, by his counsel, objected upon the ground that said testimony was incompetent, which objection was overruled by the court, and the witness permitted to testify, over defendant's objection, as above, as to what she told Villareal; to which ruling of the court the defendant excepted.) At the time the defendant forced me I noticed he had a scar on his face, and that he wore around his waist a red band or cloth, which was very dirty. My undergarments, that is, my chemise, was soiled with blood, on account of what the defendant did to me. I am a female. The place where the defendant took me and injured me, as before stated, was in the city of El Paso, El Paso County, Texas, and what I have testified to occurred about the 11th of September, of this year.

Cross-examined: My grandmother sent me to Mr. Mayer's that morning before 11 o'clock to take a pair of shoes to my sister, who was working there. I saw no one on my way there. I stayed there about half an hour, and saw no one there except my sister. I returned to my grandmother's by the same way I went. I first saw the defendant on that day, and only saw him on my return to my grandmother's. As I was going back to my grandma's I turned round and saw the defendant, who was behind me, about one and one-half varas from me. I saw him when I crossed the railroad track; after I crossed the track I met Matias Villareal. I had passed Lyons' house when he passed me, going to his sister's house, and he had gotten to his sister's house when the man (defendant) caught me. Before defendant took hold of me, I saw Matias getting into the house. I could not see Matias' sister's house from where the defendant took me. After the defendant ravished me, Matias came to where I

was, at my grandmother's house.   I saw Matias three days before the
rape occurred, which was the only time I ever saw him before.   I never
learned his name until after the offense was committed.   I saw no one on
the way from Mayer's to my grandmother's except the defendant and
Matias.   The defendant took me when the 12 o'clock whistle blew.   The
defendant had a tin can in his hand.   I was on my way to my grand-
mother's when he got me, and was in the pathway, which is about two
feet wide.   He took me to the left of the path, close to the side of the
path.   The path is the general passway to where I live.   The defendant
carried the bucket in his left hand, and set the bucket in the weeds when
he took hold of me.   He got out his knife when he got me in the bushes;
it was a black-handled knife, and was open.   He gave me the knife, but
I did not want it, and threw it away.   He had me in the weeds half an
hour, and had his hand on my mouth all the time.   He first took me on
his lap, and after that threw me down on the ground.   The defendant re-
mained there when I left.   When I was some distance from the spot I
saw him still sitting there, wiping his privates with paper.   About half
an hour after I got to my grandmother's house, Matias came there.   My
grandmother was there when I got there.   I saw my mother when they
took me home, two days after I was ravished.   She was at Clara Garcia's.
Saw my father first afterwards when he took me home.   The defendant
did not have his hand over my eyes during any of the time he had me.

Redirect: I don't know the very day of the month when what I have
related happened.   The defendant was the only man who followed me
when I was close to Lyons' house.   When Matias passed me he was about
three feet from me, and the defendant was behind me about forty feet.
Matias passed me on this side (north) of Lyons' house.

Recross-examination:   Saw Matias when he passed me.   When he
passed me he said, "How are you?"   I answered him.   I didn't know
his name then.   Witness was here shown a dirty red band, which was by
another witness shown to have been picked up on the day the outrage
occurred, at the place of its occurrence, and she then testified that the
band looked very much like the defendant wore on that day.

Luz Jaurez, being sworn for the State, testified as follows:   I know
Luz Romero.   She is my granddaughter.   On the 11th day of Septem-
ber, last, the day the crime is charged to have been committed, I lived
in this city, and she was with me that day.   On that day I sent her with
shoes to my granddaughter who was working at Mrs. Mayer's.   The little
girl returned in a very bad condition, and appeared to be dying.   I ex-
amined her, and found her privates all torn and widely open and very
bloody, and her hip was out of place.   She came walking to the house,
but bent down.   I rubbed the place at night, pulled her by the leg, put
a piece of cloth over her hips, and in that way got the bone in place.
She suffered very much for about four days after, and during that time

couldn't make water. Her underclothes were stained with blood. They were left with the justice of the peace when they held the examining trial. (The justice of the peace, Keith, was here sworn, and produced a bundle, and said it was the one containing the clothing left with him at the examining trial of the defendant. The bundle was then opened and a bloody undergarment taken out and shown the witness Jaurez, who then resumed her testimony, as follows): These are the clothes she wore at the time she was injured. Luz Romero is going on 11 years old. I can't tell the year she was born, but I remember when the Southern Pacific railroad reached this place, and she was then one month old. She was born at the Alamo. We came here the second month after her mother's confinement with her, as soon as the completion of her confinement, which, among Mexican women, is forty days, and it was about that time the railroad came, and she was a baby sucking at the breast. After the girl came home, I went to the place where the deed was committed on the same evening, and then went to the court and notified the officers, which was one or two hours after the commission of the offense. The ground was torn up, and the weeds broken and bent down where the deed was committed.

Cross-examined by defendant: "The girl's mother is my daughter, and is 23 years old. I am certain she is no older than that. I don't remember the year of her birth. The girl was with me seven days before the deed; her mother was living at Clara Garcia's. I know Matias Villareal. He came to my house a little after 1 o'clock, on the day Luz was ravished. She came back a little after 12. Her father is Prudentio Romero; he carried the girl home next day, and he came back the following week. I have seen Matias Villareal before the time the offense was committed several times, passing my house. I never saw the defendant before I saw him at the examining trial."

*H. H. Neill* and *N. B. Bendy*, for appellant.—In prosecutions for rape it is not admissible to prove the particulars of the complaint of the prosecuting witness, except to corroborate her testimony when attacked. Johnson v. The State, 17 S. W. Rep., 252; Johnson v. The State, 21 Texas Ct. App., 368; Lawson v. The State, 17 Texas Ct. App., 292; Pefferling v. The State, 40 Texas, 486; The State v. Ivins, 36 N. J. L., 233; The State v. Jones, 61 Mo., 232; Griffin v. The State, 76 Ala., 29; The State v. Knapp, 45 N. H., 148; The State v. Druso, 28 La. Ann., 952; 3 Greenl. Ev., 213.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of the crime of rape, and his punishment assessed at death.

Three bills of exception were reserved to the ruling of the court in relation to the admission of testimony. By the first bill it is made to appear that the prosecutrix was permitted to testify, "that she told her grandmother, Luz Juarez, when she got home, that a man who followed her, who had a scar on his face, took her and pulled her in the bushes, near where there is a mesquit bush, close to Mr. Lyons' house, and did bad things to her and hurt her." By the second bill it is disclosed that the same witness testified: "After I got home, Matias Villareal came to where I was at my grandmother's, and I told him that the man whom he saw following behind me with a tin bucket in his hand, and who had a scar on his face, was the man who took me and hurt me; and Matias told me that he knew him well." The third bill is reserved to the admission of the testimony of the witness Villareal, which was in substance the same as that stated in the second bill of exceptions.

The statement to the grandmother was made in a very few minutes after the act was committed, and the statement to Villareal was made in about one-half hour thereafter, and while the prosecutrix was lying on a bench, hurt and bleeding. In each instance it was objected that it was not competent for the State to prove anything the injured party stated except the fact that she made complaint of the outrage committed upon her, and that it was not proper to admit in evidence any statement she may have made as to who committed the offense, or the facts and particulars attending its commission, other than the fact that the complaint was made. The court, in signing the bills of exceptions, states "that the statements were so closely connected with the acts, both as to the time and place, as to be part of the res gestæ," etc.

The law is well settled in this State, where the injured female makes complaint of the fact that she has been ravished, that fact can be proved. It is equally well settled that the particulars of her statement or complaint can not be introduced by the State as original and independent testimony. Such evidence may, however, be introduced in rebuttal in support of her veracity, and for the purpose of establishing the accuracy of her testimony, when her credibility has been attacked by the defendant. Lawson v. The State, 17 Texas Ct. App., 292; Johnson v. The State, 21 Texas Ct. App., 368; Holst v. The State, 23 Texas Ct. App., 1; Pefferling v. The State, 40 Texas, 486; Willson's Crim. Stats., sec. 915. In this connection it may also be stated that in cases of rape the identity of the accused can not be proved by such statement of the prosecutrix, nor can it be by this means shown who committed the offense. Johnson v. The State, 21 Texas Ct. App., 368.

But these rules are inapplicable when the details of such statement are sought to be proved as res gestæ of the transaction. In one instance the details of the complaint can not be used except as corroborating testimony, while in the other it is res gestæ, and may be introduced as origi-

nal and independent evidence. The question here presented is, was the evidence sought to be excluded properly admitted as res gestæ of the transaction to which it refers? The rule authorizing evidence of the detailed statement as res gestæ is not to be confounded with that which permits evidence that complaint was made, but rejects the details and particulars of such complaint. These rules are widely different, and the distinction is plainly observed and noticed in the authorities. When res gestæ, it is original primary testimony, and can be introduced as such, but under the other rule it can only be used as sustaining or corroborative evidence.

Speaking of this difference, Mr. Bishop says: " On ordinary grounds, anything which the woman said or did of the res gestæ of the ravishment will be admissible in evidence; and there is considerable room for strengthening her testimony in this way, especially where she exhibits marks of violence in connection with expressions indicative of her physical condition. But, aside from and beyond this, it is competent to show by her or by others, or both, that, after the alleged rape, especially recently after, she complained of it to suitable persons, and exhibited, if such was the fact, marks of violence and other like indications, as confirmatory of her sworn testimony. It is of special practical importance that the complaint was recent, and explanations of any delay are competent. * * * Neither the particulars of her complaint nor the name of the person whom she mentioned as the offender can by the English and more common American practice thus be given. * * * The effect of this evidence is mainly to sustain the witness; it is not independent proof. If, therefore, the injured female does not appear as a witness, this evidence can not be given. But what is of the res gestæ, as stated in the opening of this section, is competent, whether she testified or not." 2 Bish. Crim. Proc., sec. 936, and notes; also secs. 625, 626, and notes. See also 1 Whart. Crim. Law, sec. 566. This distinction is expressly recognized by this court in Veal's case, 8 Texas Court of Appeals, 474.

In Regina v. Eyre it is said: " Whatever she [referring to the prosecutrix] said immediately after the occasion, and what was said to her in answer, is equally evidence." 2 Fost. & F. Rep., 579. The statement may be made at a time and place so remote from the principal fact as to preclude it as res gestæ of such facts, and yet not exclude it when it is offered for the purpose of showing that the complaint or statement was made. In case it was res gestæ, the details of the statement are admissible in evidence; if not res gestæ, the particulars of such statement can not be introduced. The difference between the rules is distinct and easily comprehended. If the evidence set out in the bills of exception was res gestæ, it was clearly admissible; if not res gestæ, it should have been excluded. In case of a conviction for an assault with intent to rape, this court has held that it was proper to permit a witness to testify to the

statements of the prosecutrix made with regard to the occurrence, the details of the transaction, her nervous condition, and the swollen appearance and blood upon her wrist. The statement was made a few moments after the occurrence, and it was there said: "These statements of the prosecutrix, and her appearance and condition, were heard and seen by the witness in a very few minutes after the occurrence, and were res gestæ." Lights v. The State, 21 Texas Ct. App., 308.

In Lewis v. The State, 29 Texas Court of Appeals, 201, it is said by this court: "In order to constitute declarations a part of the res gestæ, it is not necessary that they were precisely coincident in point of time with the principal fact. If they sprang out of the principal fact, were voluntary and spontaneous, and made at a time so near it as to preclude the idea of deliberate design, they may be regarded as contemporaneous, and are admissible in evidence." See also Foster v. The State, 8 Texas Ct. App., 248; Boothe v. The State, 4 Texas Ct. App., 202; Tooney v. The State, 8 Texas Ct. App., 452; Stagner v. The State, 9 Texas Ct. App., 441; Warren v. The State, Id., 619; Neyland v. The State, 13 Texas Ct. App., 536; Washington v. The State, 19 Texas Ct. App., 521; McInturf v. The State, 20 Texas Ct. App., 335; Pierson v. The State, 21 Texas Ct. App., 15; Smith v. The State, 21 Texas Ct. App., 277; Powers v. The State, 23 Texas Ct. App., 42; Irby v. The State, 25 Texas Ct. App., 203; Fulcher v. The State, 28 Texas Ct. App., 465; Craig v. The State, 30 Texas Ct. App., 619.

In Lewis' case the conviction was for murder, and the statement of the deceased was made to two witnesses, at different times, from a half hour to one and a half hours after the occurrence; in Fulcher's case the statement of the wounded party was made about thirty minutes after he was shot; and in both cases the statements were held to be res gestæ. Lewis v. The State, 29 Texas Ct. App., 201; Fulcher v. The State, 28 Texas Ct. App., 465.

In this case the statements were made to the grandmother in a very few moments after the offense was committed, and within a very short distance of the scene of the crime, and to the witness Villareal in about a half an hour. The prosecutrix was a child of about 11 years of age, badly developed for her age, and at the time of making the statement suffering great pain; was torn, lacerated, and bleeding from the effects of the recent rape, and was scared and excited. Her statement was voluntary, and uninfluenced by persuasion, suggestion, or other influence or consideration. She stated no name, and in fact she did not know the name of the perpetrator of the outrage, but could and did give an accurate description of him. He was a stranger to her. Such facts and circumstances preclude the idea of fabrication, or deliberate design in making the statements. On the contrary, they were voluntary and spontaneous; as much

so as if uttered at the very time of the outrage. The statements were res gestæ, and clearly admissible.

We have examined the other questions raised by counsel, but find no error in any of them. It is not necessary to discuss them. The charge was a clear presentation of the law of the case. The evidence discloses a most brutal assault upon a child, and a rape horrible in its details. Defendant sought to prove an alibi. His testimony was conflicting, and the witness introduced by him contradicted his individual testimony in every material aspect relating to the facts of the alibi. Defendant was positively identified by the prosecutrix as the perpetrator of the crime. Her testimony was strongly corroborated in every respect. If the witnesses testified truthfully in this case, defendant is guilty, and his conviction proper; and no discredit is thrown upon the evidence of the prosecution. As the record presents the case to us, the defendant has had a fair and impartial trial, and the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.