Charles Davis v. State.

No. 2216.   Decided February 26, 1913.

1.—Murder—Charge of Court—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence was sufficient to sustain the conviction, and the charge of the court presented defendant's theory of defense as made by the testimony as favorable as it was possible to do, there was no error.

2.—Same—Evidence—Other Transactions—Res Gestae.

Where, upon trial of murder, the evidence showed that not more than twenty yards were traveled by defendant from the time the wound was inflicted until he returned to the deceased and kicked her and used the language attributed to him, the same was res gestae and part of the transaction and admissible in evidence.

3.—Same—Evidence—Motive—Animus.

Where, upon trial of murder, it was shown that the defendant immediately after his wife was stabbed, returned to her body and kicked it, using abusive language, the same was admissible to show the animus, motive, and ill-will of defendant toward deceased, and there was no error in the court's failure to limit said testimony. Following Davis v. State, 65 Tex. Crim. Rep., 271, 143 S. W. Rep., 1161.

4.—Same—Evidence—Expert Witness—Opinion.

Where defendant introduced an expert witness and was permitted to show by him all the facts to which he could legitimately testify, there was no error in excluding the opinion of said witness as to whether or not under the circumstances in the case, the wound was intentionally inflicted or accidentally done; this was not a subject of expert testimony.

5.—Same—Practice in District Court.

If defendant expected to illicit any expert testimony, he should have so informed the court at the time, and it was too late to do so after the verdict had been rendered.

6.—Same—Argument of Counsel—Presumption.

Where the argument of State's counsel was not shown in the bill of exceptions to have been harmful to such an extent as to have been reversible error, there was no error, although the remark of counsel that the jury could presume something which had not foundation in the evidence was improper.

7.—Same—Sufficiency of the Evidence.

Where, upon trial for murder, the defendant contended that the wound upon his wife was either self-inflicted or accidental, but the evidence indicated that defendant inflicted the wound and that it would be almost a miracle to have been self-inflicted or accidental, the conviction was sustained.

Appeal from the District Court of Ellis.   Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Clyde F. Winn,* for appellant.—On question of limiting testimony of other transactions: Barton v. State, 13 S. W. Rep., 783; Richards v. State, 3 Texas Crim. App., 423; Branch Criminal Law of Texas, par. 366.

On question of argument of Counsel: Hatch v. State, 8 Texas Crim. App., 416; House v. State, 9 id, 567; Conn v. State, 11 id, 390; Hunnicutt v. State, 18 id, 498; Smith v. State, 55 Tex. Crim. Rep., 563, 117 S. W. Rep., 966; Kirksey v. 61 Tex. Crim. Rep., 298, 135 S. W. Rep., 124.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at ten years confinement in the penitentiary.

The evidence would show that appellant and his wife and several other negroes had just left one Foster's house, and were walking down the road; that appellant struck another negro Woodson in the breast with his hand and remarked: "He was the best God-damned man in the world," he had been drinking that day, and the testimony would indicate that he was laughing when he struck Woodson, but would also indicate that his wife at this time put her arms around and drew him away from the remainder of the crowd, and appellant and his wife walked down the road together. Shortly she was seen sinking to the ground, and get up and walk a little piece further, when she sunk again, and appellant walked back to her, and kicked her. One of the witnesses, Henry Thomas, tells of the occurrence in the following language: "I was along over there when Lula Davis was killed. The first thing that attracted my attention was her squatting down. I was about thirty yards from her at that time. After she got up she walked about seven steps and she fell to the right of the road on her face and then Charlie, he was about twenty yards in front of her at that time, and he turned around and said to her, 'Get up and come on.' She did not say anything. He turned around and came back and got in about three steps of her and says: 'What in the hell are you doing laying here,' and he kicked her. By that time I was in about three or four steps of her and I told him, 'Charlie don't kick that woman,' and he kicked her again and says, 'Get up God-damn you.' I says, 'Charlie don't kick her any more.' He says, 'Yes, I kicked her and whose damn business is it; says there ain't nobody got anything to do with it.' By that time the crowd had got up very close. I and Charlie then tried to help her up. We turned her over and I saw the blood on her dress. I says, 'Charlie you

have cut this woman' He says, 'No I haven't, I haven't raised my hand.' I says, 'Yes you have, let me see your pocket knife.' He ran his hand in his pocket and gave me his pocket knife. I says 'Yes you have, here's the blood on your pocket knife.' I showed the pocket knife to several others. He said he hadn't done anything to her at all —said he hadn't raised his hand. That was fresh blood on the knife. Defendant said if he had stayed at home this morning as his mind led him to none of this would have occurred. That's all I remember that I saw there or heard. Deceased did not live but about three or four minutes. I saw her—she was stabbed in the neck.''

The woman had been stabbed with a knife in the hollow at the base of the *neck,* severing, it seems, one of the carotid arteries. No one saw the blow struck, but the record makes it evident that the wound had been inflicted from the time the deceased drew appellant out of the crowd to where she fell and died, a very short distance. Appellant testified that he and his wife were walking down the road, when his wife (deceased) asked for his knife, and then recites the events as follows: ''I says, 'well my knife is in my pocket.' We were armed up together. She just ran her hand down in my pocket and got my knife. I had on a pair of overall pants and jumper. A few minutes after she got the knife, I noticed her opening a snuff box with the knife. She had the knife open and run the knife up under the lid that way and pushed the lid up that way. I noticed her opening the snuff box with the knife and I heard the money rattling in her hand. I says, 'What are you doing with my money.' She says, 'Oh yes, you told me you did not have no money.' I asked you lets go over to papa's—over to Roser. I says, 'I told you that I was just joking when you gave me the money' and we got to tussling and scuffling over the money and I got two or three dollars of the money. She says: 'Oh, I will give it back to you, it is alright any way.' So we just quit tussling and she put the money and knife all back in my pocket and we just armed up and went on down the road together. As we went on down the road after we got through playing, we went on down the road and then I says to her—she says to me: 'You know these people sure treating us nice to be strangers to us.' I says yes they are treating us awful nice to be strangers to us, and then she spoke about getting Lula Franklin to go over to Roser with her, over to her papa's. I says, 'Well you can get her to go if you want to, it don't make any difference to me. She says, 'Well alright, I will get her to go over there.' We were walking along and all at once she just squatted down. I never thought nothing—I just walked on. I thought she was fastening up her shoes or something of that kind— tying up her shoe. We were walking armed up and she went down that way and had her hand on her shoe that way. I looked back and seen she had her hand on her shoe. I kept walking on slow down the road, when I looked around, I says: 'Come on, don't you want to be with me.' That is when I seen her squatting down and I says, 'Come

on, don't you want to be with me.' She says, 'Sure I want to be with you' and she got up and started where I was and before she got where I was she just eased right down and that is the point where she fell and died. When I noticed her lying down on the ground and looked back the last time and seen her laying on the ground, I says: 'What is the matter with you, get up from there.' Ain't nothing the matter with you.' When she did not say anything, I walked up and put my foot against her and says: 'Get up from here, what do you want to do this way before all these folks.' Of course it made me kind o' angry to think she would lay down that way before all them strange people. I took hold of her with my hand and pulled her up and when I pulled her up, I discovered there was blood running down off of the collar of her dress. The first time I discovered any blood or anything was when I pulled her up. First time I found out she was hurt in any way was after she was laying down on the ground after she was dead at the point where she died. When I saw her on the ground, I told her to get up and I reached down and caught hold of her with my hand when I saw she was hurt. That is the first time I knew she was hurt, and after I knew she was hurt, I just thought then by me and her playing and scuffling over the knife—I knew that was the only way she got hurt—by me and her scuffling.''

It is thus seen that appellant by his testimony would have the wound inflicted in an accidental manner, while they were scuffling over the money. On this issue the court instructed the jury:

''You cannot convict the defendant in this case unless you believe from the evidence

(1) That the defendant inflicted the mortal wound upon Lula Davis.

(2) That he did it intentionally, with implied malice aforethought.

If you have a reasonable doubt as to whether defendant inflicted the mortal wound upon Lula Davis, you will acquit the defendant; or, if you believe from the evidence that defendant did inflict the mortal wound upon Lula Davis, but should have a reasonable doubt as to whether he did it intentionally, you will acquit defendant; or, if you believe Lula Davis herself inflicted the wound purposely or accidently upon herself, or if you have a reasonable doubt thereof, you will acquit the defendant.''

In addition to this, at the request of appellant, the court gave the following special charge: ''You are further instructed that if you believe that Lula Davis was accidently stabbed in a tussle with defendant over some money, or that she stabbed herself while engaged in a scuffle over some money, or that she in any way inflicted the wound upon herself you will acquit the defendant and say by your verdict 'not guilty;' and if you have reasonable doubt thereon you will acquit the defendant.'' Thus it is seen that the court presented the defense of appellant as made by his testimony as favorably as it was possible to do. However, appellant has several bills of exception in the record,

the first that the court erred in permitting witnesses to testify about appellant kicking his wife, and the language used by him at the time he did so. By the testimony above copied it is shown that not more than twenty yards were traveled from the time the wound was inflicted until the time appellant kicked his wife and used the language attributed to him. This, we think is conclusive that it was res gestae ,of the transaction; in fact, it was part of the transaction itself, and the testimony was properly admitted. In Branch's Crim. Law, the rule is said to be that if the acts and declarations appear to spring out of the transaction, if they elucidate it, and if they are made at a time so near it as reasonably to preclude the idea of deliberate design, then they are to be regarded as contemperaneous and are admissible, citing Griffin v. State, 44 Texas Crim. Rep., 314; Castillo v. State, 31 Texas Crim. Rep., 145; Hobbs v. State, 16 Texas Crim. App., 517, and other cases. It is also said by this author that animus, motive and ill-will is never a collateral or irrelevant inquiry, and the testimony as to the acts and conduct of appellant at that time would tend strongly to show the state of feeling toward the deceased, therefore it was not necessary to limit the effect of such testimony thereon at all. (Branch's Crim. Law, sec. 367.) Davis v. State, 65 Tex. Crim. Rep., 271, 143 S. W. Rep., 1161.

Appellant introduced Dr. West and Dr. Cheatham as expert witnesses, and the evidence would authorize the conclusion that they should have been permitted to testify to all facts to which an expert witness would be permitted to testify. Appellant, while Dr. West, was testifying, asked a number of questions seeking to elicit the opinion of Dr. West as to whether or not the wound in the neck, under the circumstances in this case, was intentionally inflicted or accidentally done. One question being, after stating the premises, "What would be your conclusion as to whether that wound was placed upon her purposely or intentionally by defendant or inflicted upon her accidentally in the scuffle over some money?" This was not a subject of expert testimony, and the court did not err in sustaining the objection. The medical knowledge of a man would not aid him in determining whether a wound in the neck was intentionally or accidentally made. And Dr. Cheathom was testifying appellant began to lay a predicate calling for an opinion as an expert, when the court stoped him. Appellant objected and reserved a bill of exceptions, stating that he "excepted for the reasons that it is a matter of expert testimony, going to show whether or not the wound was accidentally inflicted or had been inflicted purposely and intentionally by the defendant in a fight with his wife, and it being a proper question of expert testimony, throwing light on the question as to whether or not the wound was accidently inflicted in the scuffle such as defendant relates, or whether it was purposely inflicted as the State contends." This was the objection stated to the ruling of the court at the time, and as it appears he was trying to elicit Dr. Cheatham's

opinion as to whether the wound was accidently or intentionally inflicted, the court did not err in the matter. If the appellant expected to elicit any ligitimate expert testimony, he should have so informed the court at the time, and as he did not do so during the trial of the case, it would be too late to do so after the verdict had been rendered.

It appears that the prosecuting officer, during the course of his remarks, said: "the court will have to charge you that this is a case of circumstantial evidence, but as a matter of fact it is not a case of circumstantial evidence." Appellant excepted to the remarks and requested the court to instruct the jury not to consider same. There are none of the other remarks of the county attorney in this connection shown, but one would naturally conclude that he perhaps followed it up with other argument as to why he thought the testimony placed appellant and deceased into such juxtaposition to each other as to take it out of the rule requiring a charge on circumstantial evidence. Be that as it may, the remarks as copied in the bill of exceptions, isolated and alone, are not such remarks as could have been harmful to defendant. Again, appellant objected to the county attorney using the following language in his argument: "They (appellant's counsel) are talking about there being no motive in this case. How do you know but that as Charley Davis and his wife were walking along down the road there she accused him of being too intimate with some other woman; and, gentlemen of the jury, you have a right to presume that she did." The county attorney ought not to have used this language, but could the use thereof be of that harmful nature that it and of itself would call for a reversal of the case? We do not think so. The only objectionable part is wherein he told the jury they had a right to so presume. This is not the law. A jury has no right to presume anything against a defendant having no foundation in the evidence.

Appellant earnestly insists that the evidence is insufficient to sustain the verdict. He insists that if appellant inflicted the fatal wound deceased would have run, would have cried out, and made some demonstration. Generally this is true, but human experience shows there is no accounting for the conduct of a wife when her husband ill-uses or mistreats her, and the evidence clearly to our minds indicating that appellant inflicted the wound, we will not disturb the verdict, for if he did so, he offers no excuse, or justification for so doing. The place where the wound was inflicted, if the knife was in the hands of his wife, as he contends, it would be almost a miracle if she inflicted it in a scuffle—at the top of the shoulder and base of the neck.

The judgment is affirmed.

*Affirmed.*