## LONNIE STOCKTON v. THE STATE.

### No. 4347. Decided February 7, 1917.

**1.—Assault to Rape—Evidence—Res Gestae—Declarations.**

Upon trial of assault with intent to rape, there was no error in admitting testimony as to what prosecutrix told the witnesses upon reaching the house, after she had jumped out of the buggy and escaped from the defendant about two hundred yards from said house, to which she went as quick as she could and while under great excitement told of defendant's assault upon her, and exhibited her arm where he had bit her, etc. Following Castillo v. State, 31 Texas Crim. Rep., 145, and other cases.

**2.—Same—Evidence—Declarations of Prosecutrix.**

Where, upon trial of assault with intent to rape, where the prosecutrix had theretofore disobeyed a subpoena for which the case was continued, and defendant, on cross-examination, proved that she had absconded as a witness, there was no error in permitting her to testify as to the reason why she left at the time because of threats of the defendant, etc., to disgrace her; the court properly limiting the testimony.

**3.—Same—Evidence—Declarations of Third Parties.**

Upon trial of assault with intent to rape, where prosecutrix had testified that during said assault defendant had bit her on the arm, there was no error in admitting testimony that the witness saw a black spot on prosecutrix's arm two or three days after the alleged assault, nor in admitting testimony that prosecutrix complained to her father of defendant's assault upon her the first time she saw him.

**4.—Same—Aggravated Assault—Charge of Court—Consent.**

Where, upon trial of assault with intent to rape and a conviction for aggravated assault, the court charged on undue familiarity, and the evidence showed that this was without the consent of the prosecutrix, there was no error in the court's failure to submit requested charges that if this was done with prosecutrix's consent, to acquit the defendant, all the evidence showing to the contrary.

**5.—Same—Charge of Court—Assault to Rape.**

Where, upon trial of assault with intent to rape and a conviction for aggravated assault, a complaint of the charge of the court upon said offense and a refusal of a requested charge thereon, need not be considered on appeal, as that offense passed out of the case; besides, such charge of the court was correct.

**6.—Same—Aggravated Assault—Sufficiency of the Evidence.**

In an indictment for an assault with intent to rape, is included an aggravated assault in any and every way by which such an assault may be committed, and when evidence on the trial does not establish a charge of an assault with intent to rape only, and exclude an aggravated assault, then it is incumbent upon the trial judge to submit the question of aggravated assault in the general terms in which the trial judge submitted that question in the instant case. Following Ward v. State, 68 Texas Crim. Rep., 154, and there was no error in refusing a requested charge on aggravated assault which was not applicable to the facts.

**7.—Same—Aggravated Assault—Charge of Court—Undue Familiarity— Sense of Shame.**

Where, upon trial of assault with intent to rape and a conviction of aggra-

vated assault, the defendant's requested charges upon the issue of undue familiarity, sense of shame, etc., were not applicable to the facts, and the court gave a correct charge on aggravated assault, there was no error in the court's failure to submit defendant's requested charges thereon.

Appeal from the District Court of Hamilton. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of aggravated assault; penalty, a fine of two hundred dollars and forty-five days confinement in the county jail.

The opinion states the case.

*S. R. Allen* and *A. R. Eidson,* for appellant.—On question of res gestae statements: Lawson v. State, 17 Texas Crim. App., 292; Stephens v. State, 20 id., 255; Holst v. State, 23 id., 1; Martin v. State, 47 Texas Crim. Rep., 174.

On question of declarations of prosecutrix: Stephens v. State, 20 Texas Crim. App., 255; Martin v. State, 47 Texas Crim. Rep., 174.

On question of refusing defendant's requested charges: Shield v. State, 39 Texas Crim. Rep., 13; Lee v. State, 47 id., 612; Kearse v. State, 88 S. W. Rep., 363; Koen v. State, 50 Texas Crim. Rep., 145.

*E. B. Hendricks,* Assistant Attorney General, for the State.

PRENDERGAST, JUDGE.—Appellant was indicted September 4, 1915, for an assault with intent to rape Miss Leady Joiner on April 24, 1915. The indictment was returned at the first term of the court after the alleged assault. He was tried September 12, 1916, found guilty of an aggravated assault and his punishment assessed at forty-five days in jail and a fine of $200.

At the time of the assault, Miss Leady, the assaulted girl, was just nineteen years old, and lived and had been raised in the country in the neighborhood near where the assault occurred. She was a country girl. Appellant at the time was a matured man, twenty-eight years old, and had known her for ten years or more, ever since she was a young child. They had never been sweethearts, and he had never before accompanied her anywhere nor in any way waited on her.

The assault occurred in appellant's buggy early in the night of April 24th. That day about noon, or soon after, they met, both attending a picnic in the community. For a while that evening at the picnic they sat together in an open hack near another couple who sat in a buggy. Appellant claimed that while they sat in said hack, he undertook to take some liberties with her person by pinching her breasts. She swore that no such thing occurred. During the evening, somewhere on the picnic grounds, he made an engagement with her to take her that night to a party or dance in the same neighborhood. She informed him that she would spend the night with her friends, the Austeds, which was nearer to the party, or dance, they were to attend than her home. She was a welcome guest at the Austeds and was a frequent associate with the young ladies—three of them—of that family.

Mr. J. M. Austed and three of his young daughters at the time of the assault testified. So did Miss Leady and appellant. The Austeds differed as to the time appellant came there to take Miss Leady to the party, or dance. Some of them thought it was rather late. The witnesses also differed as to whether or not it was raining at the time or merely threatening to rain. Most of them testified that it was raining. As to the time, appellant himself swore: "It was dusky when I got to the house. It was not good dark when we left the house. . . . It was good dusk when we left the house." Mr. Austed testified that when appellant came to his house for said girl he advised him that the weather was so bad that he didn't hardly see how he could go out in it. He told him he would get wet. Appellant replied: "I have got the buggy pretty well curtained up and we will feel nearly as comfortable as if we were in the house." Mr. Austed offered no further objections to their going. Mrs. Bertha Harris, one of Mr. Austed's young daughters, who was unmarried at the time but married since, testified that when appellant reached her father's to take Miss Leady to the party, he asked the girl if they should go, and that she replied that she had just as well go as not, and he said it did not make any difference to him—that he would just as well go as not. She further testified: "The girl said she was not afraid of a storm and she went ahead and got ready and they left." She further swore on cross-examination: "They both seemed to want to go to the party." Miss Leady herself swore that when appellant so came after her she asked him if he thought it was too bad to go, and he said, "We would go to the party." That when he came there for her, "There come up a cloud, and it was misting some." She provided herself with wraps. Young Mr. Austed offered her his overcoat, which she took and put around her to keep from getting wet. The appellant had his buggy top up and the side curtains on.

Miss Leady further testified that when they got about 100 yards from the house he put his arm upon the back of the buggy seat back of her. She tried to get him to take it down, and when he would not she pushed it down a number of times. The substance and effect of the testimony further is, that he besought her to permit him to kiss her and to have sexual intercourse with her. She persistently refused. He then grabbed hold of her and attempted to raise her dress and put his hands on her person. That she was fighting him off all the time. That she tried a number of times to get out of the buggy and he would not let her. That he threatened to choke her, saying: "I will choke you, you damned little devil you." In order to get to the party they had to go out a gate from Mr. Austed's pasture. The Austeds and appellant and Miss Leady all testified as to the distance of this gate from Mr. Austed's house, making it from a little less than a quarter of a mile to about a half mile. She testified that when they got to this gate, she besought him to open it and drive on. He refused to do so, and stated that he would not go out of the gate at all unless

she would have sexual intercourse with him. That he worried and scuffled with her attempting to effect his purpose until she was practically exhausted. That after this course of conduct on his part at the gate lasted for some considerable length of time, he finally turned the buggy and started back the way they had come towards Mr. Austed's and got about half way, he still attempting to force her to have intercourse with him. That she could not get loose from him. That in his attempt to force her, and his struggle with her, he tore the placket of her dress and also her sleeve, and bit her on the arm just above the elbow. That finally when she saw she could not get away from him otherwise she told him that she would consent if he would turn her loose, and to fix himself. That when he turned her loose to fix himself, she caught hold of the top of the buggy, swung herself out and jumped over the front wheel. She swore: "When I got away from Lonnie I was wrestled completely down and was so nervous that I could not hardly get to the house. He called me a damn little devil a number of times and he called me a son of a b— once. He threatened to choke me till I submitted to him. . . . He had his hands everywhere (on her person) where he could get them and was trying to raise my clothing all that time. He was doing his best to accomplish his purpose. When I got out of the buggy I went right straight to the house as fast as I could and never stopped."

Mr. J. M. Austed, his said daughter Mrs. Harris, Miss Jennie Austed, another one of his daughters, and Mrs. Ida Austed Overguard, another one of his daughters, who was unmarried when the assault occurred but married when she testified, all testified to the statements of Miss Leady made to them immediately upon her reaching the house, telling them, in substance, what had occurred—the assault that appellant had committed upon her, her escape from him, and in fact, substantially what appellant had done and said to her. They all swore that when she reached the house and made these statements to them, she was greatly excited, and some said, mad also. Mrs. Harris said that she just bolted through the door and said: "Martin, get the gun, and I will go shoot that damn fool" (or "we" will do so). (Martin was Mrs. Harris' brother, a married man.) She further swore that Miss Leady was carrying her belt in her hand; that it had been broken or torn off of her; that her hair was down; that her clothing was wet and muddy. They all testified that she exhibited to them the wound on her arm and told them at the time that appellant had bitten her there. Appellant swore that when she jumped out of the buggy and started to the Austeds he thought she was in earnest; "she acted like she was." That he did not follow her at all. "I stood there a minute or two and waited . . .," and then went on to his home.

The witnesses differed as to the length of time which had elapsed from the time appellant started with Miss Leady, ostensibly to the party, until she thus returned, one of them saying that it was only a short time after they left until she thus returned, others that it was

an hour or two, some that it was less than an hour. On this point appellant himself in his direct testimony swore: "I suppose it was about thirty minutes from the time the girl and I left Mr. Austed's until she jumped out of the buggy." On cross-examination he said that he had heard Mr. Austed and his girls testify that it was from an hour to two hours from the time they left until the girl returned to the Austeds, and said there was a mistake about the time, and he swore again: "I think it was about thirty minutes after I left before she jumped out of the buggy."

He testified in substance that soon after they left the Austeds' house that night, he and Miss Leady got to hugging and kissing. She positively denied all of this, but said after he had exhausted her in her struggles to protect herself, he did kiss her but without her consent. He swore he did not drive to said gate at all with her, nor stop there; that he only went about half way to the gate and stopped, and that that was where she jumped out of the buggy and went back to the Austeds. He swore that when he went for her that night he did not intend to take her to the party, because he did not want to be seen in company with her; that he did not tell the girl that he did not intend to take her to the party, and that he supposed she thought he was; that she did not know that he did not intend to take her to the party; that he did not tell her he was not. He further swore that while he was attempting to induce the girl to yield to him, "I put my hand over on her leg and she objected to that, . . . and every time I put my hand on her leg she would push it away, . . . and I put my hand over on her leg, and she says, 'Damn you, keep your hands off of me.' " Mr. Austed swore that the next day he went down to this gate and tracked appellant's horse and buggy to the gate and there saw where the horse and buggy had been stopped some time; that the horse made tracks there showing this; that then the buggy was turned round and driven back up to about where the girl jumped out of it, and there it was again stopped. Mrs. Harris swore substantially to the same thing. Appellant denied that he had bitten the girl on the arm, as she swore he had. All of the Austeds swore that she exhibited her arm to them that night immediately upon reaching the house when telling them of appellant's assault on her. They swore that the wound on her arm was red and inflamed and that it was a fresh wound and about the size and shape of a bite. Miss Leady's father swore that his daughter returned to his home Monday, which was the first time he had seen her after the assault on the Saturday night before, it having rained all day Sunday and she remained at the Austeds until Monday, and that she then complained to him that appellant had insulted her and exhibited to him this bite by him on her arm. Appellant himself testified in substance that a day or two later he went to Miss Leady's father at his home, tried to get him, and through him, the girl not to prosecute him, and in substance admitted that he had insulted and assaulted her on said occasion. Mr. Joiner swore appellant stated to him that he

was very sorry he had treated his daughter like he had, asked his forgiveness therefor, and stated that he would guarantee that it would never happen again; that a prosecution of him would be a lot of trouble to both of them; that it would cost both a whole lot. "I asked him if he had any provocation for doing what he did do, and he said he had not, that that was just his besetting sin." Appellant swore that he saw Mr. Joiner at the said time and place, and among other things said to him: "Mr. Joiner, that would be a nice thing to go out in the country, wouldn't it, a tale like that, and it would be a disgrace to the community and to our families and to our fathers and mothers." He further swore that when he learned the girl and her father had turned him in to the officers, he immediately left that country—fled; that later, when he was arrested and put in the calaboose at Mart, in McLennan County, he escaped therefrom and went to St. Louis, where he was arrested for this offense. The sheriff of Hamilton County hunted for him everywhere after the prosecution was begun, and something like a year thereafter located him in St. Louis and had him arrested and returned therefrom.

Appellant objected to the testimony of the Austeds wherein they testified to what Miss Leady told them immediately upon her reaching the house after she had jumped out of the buggy and escaped from appellant, claiming that it was not res gestae but hearsay. Some of the testimony clearly showed that the buggy was only about 200 yards from the Austeds' house at the time Miss Leady jumped therefrom and escaped from appellant—some that it might have been about twice that distance. It shows without question that Miss Leady hastened to the house when she jumped out of the buggy and fled from appellant, and got there just as quick as she could and immediately and spontaneously, while under the greatest excitement, told of appellant's assault of her, and exhibited her arm where he had bit her. There can be no question from the authorities that this was res gestae and clearly admissible as such, as the lower court correctly held. Castillo v. State, 31 Texas Crim. Rep., 145; Sentell v. State, 34 Texas Crim. Rep., 260; Conger v. State, 63 Texas Crim. Rep., 312; Sharp v. State, 71 Texas Crim. Rep., 633; Valdoz v. State, 71 Texas Crim. Rep., 487; Fuller v. State, 69 Texas Crim. Rep., 534; White's Ann. P. C., sec. 1058; 2 Vernon's Ann. P. C., pp. 613-14-15, where a large number of cases are collated; Pilcher v. State, 32 Texas Crim. Rep., 557; 2 Branch's Ann. P. C., sec. 1874, where a large number of cases are collated.

After the officers caught appellant and brought him back a term of court came on at which time this case was to be tried on a certain day. The State had a subpoena issued for Miss Leady, which was served upon her while she was at the depot intending to leave the day the case was set for trial. She did not obey the subpoena, but left and went somewhere in Southern Texas and the case was continued because thereof. Appellant proved by her on his cross-examination of her that she had thus absconded as a witness at the time the case was to be

tried, thus attacking the truthfulness of her testimony against him. Thereupon, the court, over appellant's objections, permitted her to testify the reason why she left at the time, which was that Lee Moss, a friend of appellant's and hers, came to her and told her that Ed Perry, a banker in Hamilton, was backing appellant with all the money he needed, and if she remained in Hamilton County and appeared as a witness against him, Perry and appellant would disgrace her by bringing boys from Waco and McGregor to swear that they had had intercourse with her, and that was the cause of her leaving. The court so explained appellant's bill on this subject, and further stated that the occasion of her leaving was a part and parcel of the same transaction, but that he explained to the jury that in no event could the statements of Miss Leady be considered as evidence of defendant's guilt, and instructed them not to consider the same against him. Appellant swore that the evening he was brought back from St. Louis he was out and talked with the boy Lee Moss about this case against him; that he did not authorize him to tell the girl what she says he did, nor know he was going to make that statement to her, "but if the boy told the girl that she might have believed it." In our opinion, under the circumstances, the court was correct in admitting this testimony, as thus limited.

Appellant has another bill, complaining that the court permitted the county attorney to testify that two or three days after the assault, when Miss Leady and her father came to him to institute a prosecution against appellant for the assault upon her, he saw a black spot on prosecutrix's arm. The court did not permit the witness to testify what Miss Leady said to him caused it. This testimony was admissible. The length of time after the assault went to its weight only and would not make it inadmissible. See the authorities above cited. Neither did the court err in permitting Miss Leady's father to testify that she complained to him of appellant's assault upon her the first time she saw him, just as soon as she got home. The court excluded any details of what the girl told her father. Besides, as to this matter, appellant himself admitted to her father the assault by him upon her, as shown above.

The appellant duly requested, but the court refused, his special charge as follows: "If you believe from the evidence that the defendant, Lonnie Stockton, used undue familiarity or indecent conduct with the person of prosecutrix, Leady Joiner, but that he had no intent to injure her, or cause a sense of shame or other disagreeable emotion of the mind, and that he had good reason to believe that the advances made to her would not create in her a sense of shame or other disagreeable emotion of the mind, and that they did not in fact do so, you will acquit the defendant." In his bill to the court's refusal to give this charge he contends that it was applicable to and demanded by the evidence in this: "The defendant's testimony showed that the liberties he took with the prosecutrix were with her consent. The testimony of

the prosecutrix did not show that the liberties defendant took with her caused a sense of shame or humiliation. The court's charge did not define to the jury to tell them what constituted an aggravated assault by undue familiarity with the person of a female by a male." The court in approving this bill did so with this explanation and qualification: "The defendant swore that his attempt to fondle the person of prosecutrix was opposed by her and that his effort to have intercourse with her was refused, rejected and repelled and opposed to the point of her escaping from his buggy and fleeing homeward through the rain and mud in the night-time. This took question of consent out of the case. However, that portion of the main charge has been approved by our Court of Criminal Appeals in cases like this on the aggravated assault feature. The defendant was only convicted of aggravated assault." This bill, as the record shows, was prepared, allowed and filed long after the court adjourned.

As stated by the court in his qualification, and as clearly shown by the testimony of the appellant himself quoted above, his contention as the reason why this charge should have been given, "that the liberties he took with the prosecutrix were with her consent," was not true, but the reverse of this were the facts, as specifically stated by the court in his qualification and of his reasons why he refused this charge. She did not consent to the liberties he took with her person, as appellant himself in substance and effect so testified. Again, the testimony unquestionably established that his assault and the liberties he took with her person by force did cause her a sense of shame and humiliation, as shown by her testimony and the res gestae statements proven by the Austeds. It would not be necessary to show this for either the girl or the Austeds to state specifically that she used the words that it caused her a sense of shame and humiliation. Her whole conduct from first to last, even as testified to by appellant himself, conclusively shows this.

There was no objection whatever to the court's charge in any particular. The charge aptly and correctly defined the law as to what was necessary to make the offense of an assault with intent to rape. This specially requested charge seems to have been requested on that issue. As appellant was found not guilty of that crime, any question about the charge on that subject passed out, as has all the time been held by this court. On the other issue of an assault upon the girl the court in his charge told the jury as follows: "1. The use of any unlawful violence upon the person of another with intent to injure such other person, whatever be the means or degree of the violence used, is an assault and battery. Any attempt to commit a battery, or any threatening gesture, showing in itself or by words accompanying it an immediate intention coupled with an ability to commit a battery, is an assault. 2. By the expression 'coupled with an ability to commit a battery' is meant that the person making the assault must, at the time, be in such position and within such distance of the person assaulted to enable him to commit a battery on such person by the means used."

Then follows a correct definition of rape and the essentials necessary to be proved in order to constitute an assault with intent to rape. Then correctly and fully he submitted the issue to the jury for a finding on the question of the alleged assault with intent to rape, and as to the assault he instructed the jury: "Keeping in view the foregoing definitions of assault, . . . if you should find from the evidence beyond a reasonable doubt that the defendant made an assault in and upon the person of Miss Leady Joiner, as that term ·has been defined to you, but you have a reasonable doubt as to whether he made said assault with the specific intent to rape the said prosecuting witness by force as rape by force has been defined to you, then in that event you will acquit the defendant of an assault with intent to rape and convict him of an aggravated assault and assess his punishment at a fine of not less than twenty-five nor more than one thousand dollars or by confinement in the county jail not less than one month nor more than two years or by both such fine and imprisonment."

Our statute expressly prescribes (art. 771, C. C. P.): "Where a prosecution is for an offense consisting of different degrees, the jury may find the defendant not guilty of the higher degree, but guilty of any degree inferior to that charged in the indictment." The next article prescribes: "The following offenses include different degrees: (Sub. 2.) An assault with intent to commit any felony, which includes all assaults of an inferior degree." And article 837, C. C. P., in prescribing for what causes new trials shall be granted "and for no other" states: (Sub. 9.) "A verdict is not contrary to the law and evidence, within the meaning of this provision, where the defendant is found guilty of an offense of inferior grade to, but of the same nature as, the offense proved." This court, and the Supreme Court when it had jurisdiction of criminal cases, have uniformly held that in an indictment for an assault with intent to rape is included an aggravated assault in any and every way which such an assault may be committed, and that when the evidence on the trial does not establish the charge of an assault with intent to rape only and exclude an aggravated assault, then it is incumbent upon the trial judge to submit the question of aggravated assault in the general terms in which the trial judge submitted that question in this case. Curry v. State, 4 Texas Crim. App., 574; Brown v. State, 7 Texas Crim. App., 569; Irving v. State, 9 Texas Crim. App., 66; McGee v. State, 21 Texas Crim. App., 670; Shields v. State, 32 Texas Crim. Rep., 498; Pefferling v. State, 40 Texas, 487; Davis v. State, 20 Texas Crim. App., 302; Peterson v. State, 12 Texas Crim. App., 650; Bittick v. State, 40 Texas, 117; James v. State, 36 Texas, 645; Jones v. State, 21 Texas Crim. App., 349; Givens v. State, 6 Texas, 344; Gardiner v. State, id., 348; Johnson v. State, 17 Texas, 515; Lacoume v. State, 65 Texas Crim. Rep., 146; Ward v. State, 68 Texas Crim. Rep., 154. In addition to all this, the said special charge is not the law applicable in this case

and should not have been given, and the court correctly refused it because it wholly ignored the proof in two particulars—(1) in that appellant by his own testimony as well as that of Miss Leady shows that he committed an aggravated assault upon her in that he more than once put his hand upon her leg without her consent, as expressly testified to by appellant himself; (2) because the positive, unequivocal testimony of Miss Leady showed that he violently bit her on the arm. The testimony of all the Austeds as to the res gestae statements positively showed this, and the physical facts on her arm demonstrated it. And said special charge told the jury peremptorily to acquit the defendant if his undue familiarity and indecent conduct with her person was with no intent to injure her and cause her a sense of shame or a disagreeable emotion of the mind. Therefore, in no event was this charge the law applicable to this case, and the court correctly refused to give it.

The only other question is, he claims the court erred in refusing to give his only other special requested charge, which was as follows: "Before you can convict defendant of an aggravated assault, as defined in the main charge, you must find that defendant not only used undue familiarity or indecent conduct with the person of prosecutrix, Leady Joiner, but that the same caused a sense of shame or other disagreeable emotion of the mind. And in this connection I charge you that the mere use of indecent and insulting language can not constitute an aggravated assault by a male upon a female, and if you believe that the disagreeable emotion of the mind of prosecutrix, if any, existed, was caused by any language used by defendant to her, and not caused by the fondling of her person, you will acquit him." His claim, as shown in his bill, is that this charge was the law applicable to the evidence in that there were only two witnesses testifying to what occurred, defendant and prosecutrix, stating that the defendant testified that the prosecutrix cursed him, and she, while admitting that she cursed him, also claimed that he cursed her, and that defendant's testimony was to the effect that she became offended not at what he did but at something he said. The court in allowing this bill explained and qualified it thus: "The defendant swore that his attempt to fondle the person of prosecutrix met with her objections and that his advances were refused, rejected and repelled, until finally the girl escaped from his buggy to be rid of him and that she walked back to the house she was staying at for the night through the rain and mud. This took the question of her consent out of the case. However, the charge I gave on aggravated assault has been approved in previous cases tried by me where the facts were similar. The defendant was only convicted of aggravated assault, a misdemeanor." What we have said about his other requested charge is applicable to this. In no event did the court commit any error in refusing to give this charge under the circumstances of this case.

The judgment will, therefore, be affirmed.        *Affirmed.*