JOHN MCKINNEY, ALIAS GEORGE JACKSON, v. THE STATE.

No. 1643.  Decided April 12, 1899.

1.  Murder—Evidence—Res Gestae.

On a trial for murder, statements made by deceased, who, within five minutes after he was shot, got into the witness' wagon to go to his home some three-quarters of a mile, are admissible in evidence as part of the res gestae, there being nothing to indicate that the statements were not spontaneous.

2.  Homicide in Prevention of Robbery—Charge.

On a trial for murder, where it appeared that in a previous scuffle between the parties deceased took defendant's knife from him and put it into his pocket, saying, "I will show you how to cut me with a knife," and got into a wagon and rode off; whereupon the defendant followed, grabbed a whip from the wagon and struck at deceased, and deceased jumped off the wagon with his hand in his pocket and defendant shot him; Held, the court did not err in refusing a special instruction upon homicide to prevent a robbery, since the circumstances surrounding the transaction preclude any thought of robbery.

3.  Confession.

.Where it is expressly admitted by defendant that he was properly warned by the county attorney before making the statement or confession, such statement or confession is properly admissible in evidence.

APPEAL from the District Court of Ellis.  Tried below before Hon. J. E. DILLARD.

Appeal from a conviction for manslaughter; penalty, five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Jim· Callahan, on the 23d of September, 1898, by shooting him with a pistol.

The opinion states the facts.

No brief for appellant has come to the hands of the Reporter.

*Robt. A. John,* Assistant Attorney-General, for the State..

BROOKS, JUDGE.—Appellant was convicted of manslaughter, and his punishment assessed at confinement in the penitentiary for a term of five years; and he prosecutes this appeal.

Appellant's first assignment of error is that the court erred in permitting the State to prove, by the witness T. A. Morrison, the conversation that occurred between said witness and deceased as they were going from the place of the difficulty to the home of the deceased.  In order to properly consider this assignment, we copy the bill of exceptions upon which the same is predicated, as follows: "T. A. Morrison, a witness for the State, testified that he was present, and saw the difficulty, at Ennis, in Ellis County, when Jim Callahan was shot by defendant; that he drove up to the store, and asked deceased, Callahan, to move his wagon, and saw everything that occurred from that time until the shooting; that about five minutes after the shooting he took deceased, Callahan, in his wagon and drove him to his (deceased's) residence, three-quarters of a mile from the store, where the difficulty occurred.  The witness was then

asked by counsel for the State to relate what Jim Callahan said to him about the difficulty on the way from the store to said Callahan's residence; and, over the objection of defendant, said witness was permitted by the court to state as follows: 'I asked Callahan how it happened, and what brought about the difficulty; and he told me that they had a difficulty about a cartridge, and defendant had stuck his knife in his leg, and he took the knife away from defendant. I asked him to show me where he stuck the knife in his leg, and he could not find it. We tried to find some cut in his pants, where he said he was cut; but there was none to be found. He did not pull up his pants. I asked him why he jumped off the wagon, and ran after the boy; and he said, "Because the boy was trying to get a pistol out of his pocket, and he thought he could get to him before he shot him." And I asked him which shot hit him, and he said, "The second shot;" that he had hold of his hand, and thought the shot went down, and not in. I got him home, and he got out and went in himself. He said he had been trying to get the boy to leave the store before the difficulty.' Defendant's objections to this testimony were that it was not any part of, or connected with, the difficulty; that it was too remote, and not made under such circumstances as to be admitted as a part of the res gestae; that it was ex parte, and hearsay. All of which exceptions were by the court overruled, and the witness permitted to testify as above; said testimony being admitted as res gestae. To which rulings defendant then and there excepted, and saved this bill of exceptions thereto."

It will be observed from an inspection of the foregoing bill, that the appellant's objection to the admission of the testimony was that it was not any part of, or connected with, the difficulty; that it was too remote, and not made under such circumstances as to be admitted as a part of the res gestae; that it was ex parte, and hearsay. It will furthermore be seen from an inspection of the bill that it is not made to appear how long after the witness Morrison and deceased got in the wagon or buggy, and started towards the deceased's home, before the conversation was had by the witness with the deceased. The statement in the bill as Morrison's testimony is that, about five minutes after the shooting, he took the deceased, Callahan, in his wagon, and drove him to his (deceased's) residence, three-quarters of a mile from the store where the difficulty occurred. Witness was then asked by counsel for the State to relate what Jim Callahan said to him about the difficulty on the way from the store to said Callahan's residence. We have repeatedly held that, where appellant relies upon such testimony as not being admissible, under the rules of this court it is the duty of appellant to show, by a proper bill, such facts as indicate it is not admissible. The statement of deceased to the witness Morrison may have been, and probably was, made immediately after getting into the wagon. If so, it was made within five minutes after the shooting. We have further held that we can not look to anything but the bill of exceptions to learn when the conversation of which appellant complains occurred. However, giving appellant the

benefit of the doubt in this matter, we think, under the circumstances of the shooting, coupled with the fact that the deceased got into the wagon within five minutes and started home, and had to go something like three-quarters of a mile in order to get home, that a statement made by deceased under these circumstances would not be hearsay, as indicated in the appellant's bill of exceptions, but would be res gestæ of the transaction, and come within the well-known rules of this court on the subject. The declarations and admissions of a party, to be admissible as res gestae, should be contemporaneous with the transaction. If the declarations appear to spring out of the transaction, if they are voluntary and spontaneous, and made at a time so as to preclude the idea of design, then they are to be regarded as contemporaneous. We think the declarations and statements of the deceased, immediately after this shooting, are clearly spontaneous; and there is no evidence of any design on the part of the deceased to fabricate the statement, or to make out evidence upon which to predicate a prosecution. Nor is there any evidence in the bill of exceptions indicating anything other than the fact that it was voluntarily made, without any design whatever. It is not necessary, we take it, to elaborate on this question; and we deem it only necessary to say that the authorities are manifold in this State supporting this proposition. However at variance with this view of the law the older English decisions and authorities may have been, it is clear now that the long train of authorities in this State amply supports this position. See Ex Parte Albitz, 29 Texas Crim. App., 128; Weathersby v. State, 29 Texas Crim. App., 278; Lewis v. State, 29 Texas Crim, App., 201; Fulcher v. State, 28 Texas Crim. App., 465; Craig v. State, 30 Texas Crim. App., 619; Castillo v. State, 31 Texas Crim. Rep., 145; Ingram v. State (Texas Crim. App.) 43 S. W. Rep., 518.

Appellant's third assignment of error is "that the court ered in failing and refusing to charge the jury, in connection with the charge given on the subject of homicide to prevent robbery, and defining what constituted robbery, that, in determining whether or not deceased intended to deprive defendant of his (defendant's) property, the jury must look at and decide that matter from the standpoint of the defendant, whether such was the deceased's intention or not; and if defendant believed such was deceased's intention, and the circumstances and surroundings were such as to lead a reasonably prudent person, situated as defendant was, to such conclusion, defendant, so believing, would be justifiable in killing the deceased."

The substance of the testimony in this case is contained in the testimony of Charley Matthews, who testified for the State, as follows: "I know defendant. First knew him in Corsicana, several years ago. Saw him the day of the shooting. Was with him from 10 or 11 o'clock in the morning, until the shooting occurred, about 3 or 4 o'clock in the afternoon. My brother, Chase Matthews, was also there. We were at the depot, and around town together, until about 2 or 3 o'clock, when we went out to the store of Mr. Nichols, where the shooting occurred.

The defendant, myself and brother were sitting on some barrels in front of the store, and myself and defendant were whittling on some cartridges. Jim Callahan, the deceased, who worked at Mr. Nichols' store, came out of the store, and defendant held up the cartridge he was whittling on, holding the cartridge between his fingers, with the ball end pointing in the direction of the deceased, and said to him, 'Are you afraid of it?' Defendant then struck the cartridge with the handle of his knife, and knocked it out of his fingers, onto the gallery where we were sitting. Deceased put his foot on it, and defendant tried to get it out from under the deceased's foot. Deceased reached down and got the cartridge and put it in his pocket. The defendant, who still had his knife in his hand, drew it back by his side. I don't know what he drew his knife back for. Deceased caught him and threw him down and took his knife away from him, and shut it up and put it in his (deceased's) pocket. While they were down scuffling, defendant seemed to be choked. He tried to say something, but I could not understand it. I did not see deceased choke him. After deceased got the knife and put it in his pocket, he got off defendant, and defendant got up, and said, 'You're not mad are you?' Deceased made no reply. Defendant then said, 'Give me knife,' and repeated it several times. Deceased paid no attention to him, and made no reply. About this time Mr. Turner's delivery wagon drove up, and deceased got into Mr. Nichols' delivery wagon and started to drive off. Defendant again asked him for his knife, but deceased made no answer; and, as the wagon started off, the defendant jumped, and got deceased's whip out of the back end of the delivery wagon, and ran up by the side of the wagon, and struck deceased on the back with the whip. Defendant immediately stepped back a step or two, and put his hand down towards his pocket, or the waistband of his pants, and commenced to fumble about. Deceased stopped the wagon immediately after he was struck, jumped off, and started hurriedly towards the defendant. Just before deceased got to defendant, the first shot was fired, and I saw the dust fly; and, after deceased got hold of defendant, the second shot was fired by defendant. I can not say whether the second shot was fired after deceased got defendant down or not. It was about the time they were going down. Deceased threw the defendant down, and was holding him. I think the second shot was the one that hit the deceased. After the second shot some one ran out of the store, took the pistol out of defendant's hand, and deceased then got up off defendant, and defendant got up and said, 'If you had given me my knife there would not have been any trouble.' When deceased got up, some one asked him if he was shot, and he said, 'Yes.' While deceased had defendant down, I did not see him strike or choke him, but he seemed to be trying to get the pistol out of defendant's hand."

The following statement was made by defendant while in jail, after being duly warned: "My name is John McKinney, and I was 17 years old on the 4th of September. I was born in 1881, in Johnson county. My father's name is Frank H. McKinney.    He now lives somewhere

near Corsicana. I ran away from home. I told yesterday my name was George Jackson, because I did not want my people to know I was in trouble." After some other matters not germane to the main issue in this case, he further stated: "I was cutting a cartridge with my knife, dropped it, and Jim Callahan put his foot on it. I tried to get it out from under his foot, and we had a scuffle, and he took the knife away from me and put it in his pocket. He said, 'I will show you how to cut me with a knife,' put it in his pocket, and jumped in the wagon. When he said, 'I will show you how to cut me with a knife,' I asked him who cut him with a knife; and he said, 'Never mind.' When he got in the wagon and started off, I grabbed the whip out of the wagon, and drew it back to hit him with it, but did not hit him. He jumped down off his wagon, put his hand in his pocket, and was drawing the knife. I then drew my pistol and shot, but did not shoot to hit him the first time. Just as he started off the wagon I turned, ran about three steps, when I turned my head, and saw him getting his knife. I turned and shot to scare him. I then ran again about six or seven, maybe ten steps, when he overtook me, and put his hand on my shoulder and turned me around. I then shot him in the stomach. He did not have the knife at the second shot. As soon as I fired the first shot, he took his hand out of his pocket. Just as I fired the second shot, he had one hand on my shoulder (left), and was reaching for my other arm or hand with his other hand. I pulled the pistol when I saw him getting the knife, and ran with it in my hand. After the second shot he threw me down, had his foot on my arm, and was trying to take the gun out of my hand. I tried to shoot him again, while I was down, but don't know whether it went off or not. I shot to hit him the second shot. He did not have the knife, but had hold of me. He never tried to hit me, and the only time he hurt me was when he hurt my hand trying to take the gun away from me. When he got up I told him to give me my knife. I had asked him for the knife two or three times before he got in the wagon. Some man asked him if he was hit, and he said 'Yes; he got me one in the belly.' I did not say, 'If you had given me the knife, you would not have got shot.' He dropped the knife on the doorstep as he went in the store after the shooting. I was also going towards the door, but some man picked it up before I got to it. I shot Jim Callahan because I was afraid of him."

We have copied in detail this much of the testimony, both for the State and the defendant, and the remainder of the testimony is in general line with the foregoing. We do not think that the evidence in this record, as indicated by this statement from the same, authorized the court to charge on robbery. We think there is a total absence of any testimony going to show that deceased was attempting to rob appellant. It is true he took appellant's knife away from him; but all the testimony indicates that he did not intend to appropriate the knife to his own use and benefit, and all the circumstances surrounding the transaction preclude any thought of robbery. The court, however, charged on robbery, but his charge is not as full as appellant's requested charge, though still, in

view of the fact that the evidence does not raise the issue, we find no error in the action of the court refusing to give appellant's requested charge on that question.

Appellant's fourth assignment of error is that the court erred in refusing to set aside the verdict, because the testimony shows that the killing was done to prevent robbery, and in fear of death or serious bodily injury. As stated, we do not think this contention correct.

Appellant's fifth assignment of error is that the court erred in permitting the prosecuting attorney to offer in evidence, and to read to the jury, the statement made by defendant in writing, set out in the statement of facts, and procured from the defendant under the circumstances related in said statement of facts, as the effect of the same amounts to the State introducing the defendant as a witness to testify against himself, in violation of both the constitutional provision, providing that a person charged with crime shall not be compelled or required to testify against himself, and the statute, that gives the defendant the right to testify in his own defense, but provides that he shall not be required to testify, and, on his failure to do so, the State shall not refer to or comment on such failure." We find this statement in the record with reference to the action of the court permitting the statement of defendant to be introduced: "Before the introduction of this statement, it was admitted by defendant and his attorney that the following statement was made by defendant after he had been properly warned by the county attorney that he could not be compelled to make any statement and need not make any unless he desired to do so, and that, if he did make any statement it could be used against him as evidence." We only deem it necessary to add that we have repeatedly held that a statement made by defendant, after being properly warned, in jail or anywhere else, is admissible in evidence; and the record before us discloses the fact that defendant was properly warned, and there is no controversy over the fact that he was properly warned, but on the contrary, it was agreed that he was properly warned by the county attorney. We find no error in the record, and the judgment is affirmed.

*Affirmed.*