CAULEY GILLESPIE v. THE STATE.

No. 4217.   Decided November 22, 1916.

Rehearing denied December 20, 1916.

### 1.—Murder—Bloody Clothing—Evidence.

Where, upon trial of murder, expert witnesses had described the location, nature and character of the wounds, and there was no question about this matter, the defendant not introducing any testimony to vary the State's testimony on this issue, which was clear and unequivocal, and there was no issue of the relative position of the parties at the time the fatal wound was inflicted, it was reversible error to introduce in evidence the bloody clothing of deceased over the objection of the defendant. Following Corley v. State, 69 Texas Crim. Rep., 626, and other cases. Prendergast, Presiding Judge, dissenting.

### 2.—Same—Bloody Clothing—Rule Stated.

The general rule is that unless the bloody clothing would serve to illustrate some purpose with reference to the position of the parties and character of the wounds, which was in issue in the case, affirmed on one side and denied on the other, that the admission of the bloody clothing in evidence is error. Following Cole v. State (65 S. W. Rep., 530), and other cases.

### 3.—Same—Evidence—Conversation—Res Gestae.

Upon trial of murder, it was reversible error not to permit a witness for the defendant to testify to a conversation with defendant a few minutes after the difficulty while still under the excitement of the transaction to the effect that he would not have killed the deceased if he did not have it to do, etc., as this was res gestae and not a self-serving declaration. Following Craig v. State, 30 Texas Crim. App., 619, and other cases. Prendergast, Presiding Judge, dissenting.

### 4.—Same—Rule Stated—Res Gestae—Self-serving Declaration.

Res gestae statements may sometimes operate as self-serving but if they are res gestae they are still admissible in evidence, especially wherever the State

attacks the defendant's testimony on the ground that it was fabricated and false. Following Messer v. State, 43 Texas Crim. Rep., 97.

**5.—Same—Evidence—Self-defense—Seeking Explanation—Charge of Court —Rule Stated.**

Upon trial of murder, the defendant had the right to show that he sought deceased to talk to him and explain the matter upon which they disagreed, and at which deceased had taken offense, and where the court's charge did not properly submit this matter to the jury, he should have given the requested charge which did so. Following Shannon v. State, 35 Texas Crim. Rep., 2. Davidson, Judge. Prendergast, Presiding Judge, and Harper, Judge, dissenting. Following Williford v. State, 38 Texas Crim. Rep., 393, and other cases.

**6.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the court's charge on self-defense was full and fair and no limitation placed thereon in any respect, there was no reversible error in refusing the special charges requested. Following Harrelson vs. State, 69 Texas Crim. Rep., 588, and other cases. Davidson, Judge, dissenting.

**7.—Same—Argument of Counsel.**

Where, upon trial of murder, the argument of State's counsel was not of such character as to constitute reversible error, there was no error in refusing a special charge thereon. Davidson, Judge, dissenting.

**8.—Same—Deadly Weapon—Charge of Court.**

Where, upon trial of murder, the instrument used was a pocket knife with which the wound was inflicted which caused the death of the deceased, there was no error in not submitting a charge thereon as to whether the knife was a deadly weapon. Davidson, Judge, dissenting.

Appeal from the District Court of Clay. Tried below before tne Hon. Wm. N. Bonner.

Appeal from a conviction of murder; penalty, nine years imprisonment in the penitentiary.

The opinion states the case.

*R. E. Taytor* and *Wantland & Parrish,* for appellant.—On question of introducing bloody clothing: Williams v. State, 136 S. W. Rep., 771, and cases stated in opinion.

On question of court's charge on self-defense: Grant v. State, 65 Texas Crim. Rep., 266; Orner v. State, 65 Texas Crim. Rep., 137, 143 S. W. Rep., 935; Bailey v. State, 144 S. W. Rep., 996; McPeak v. State, 80 Texas Crim. Rep., 50, 187 S. W. Rep., 754.

On question of res gestae statements: Lewis v. State, 29 Texas Crim. App., 201; Fulcher v. State, 28 Texas Crim. App., 465; Stagner v. State, 9 id., 440; Craig v. State, 30 id., 619; Castillo v. State, 31 Texas Crim. Rep., 145, 19 S. W. Rep., 892; Boothe v. State, 4 Texas Crim. App., 202.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of bloody clothes: King v. State, 13 Texas Crim. App., 277; Adams v. State, 48 Texas Crim. Rep., 452; Lucas v. State, 50 id., 219; Milo v: State, 51 id., 201.

On question of res gestae: Stephens v. State, 20 Texas Crim. App., 255; Lynch v. State, 24 id., 350; Walker v. State, 13 id., 618; Messer v. State, 43 Texas Crim. Rep., 97.

On question of self-defense: Ford v. State, 77 Texas Crim. Rep., 252, 177 S. W. Rep., 1176, and cases cited in opinion. .

DAVIDSON, JUDGE.—Appellant was convicted of murder, his punishment being assessed at nine years confinement in the penitentiary.

Briefly, the evidence discloses that appellant was engaged to the sister-in-law of deceased, Murphy. Her name was Cynthia Sims. She subsequently married appellant. She, her mother and a younger sister were at the time of the homicide either visiting or living at deceased's, Murphy. Shortly after the killing appellant married Cynthia Sims, and had been married to her about two years at the time of this trial. There was some objection by deceased and some members of his family to the attention appellant was paying to Miss Sims. On the night before the homicide the following day, appellant called for Miss Sims and took her to a nearby neighbor's. After they left the parlor some "rubber goods," as the witnesses called it, were found in the parlor folded in tissue paper. This enraged Murphy, and he stated that appellant could never enter his house again except over his dead body, and that he intended to talk with him or hold him to account for the matter. The next day Miss Sims was at church, as was appellant, and she informed him of the fact that Murphy would not permit him again to come to his house. She suggested to him that he had better not come; that Murphy had stated he could not enter his house any more except over his, Murphy's, dead body. In the evening after this conversation between Miss Sims and appellant, appellant drove up in front of Murphy's residence and holloed "Hello." Murphy went out to where he was sitting in a buggy. What occurred there is detailed by the witnesses, except a conversation. None of them seemed to have heard the conversation, but appellant took the witness stand and testified as to that part of the transaction. When Murphy went from the residence to the gate, after a brief conversation, the witnesses practically agree that he either got in the buggy or partially in the buggy where appellant was. There is some divergence as to the relative position of the parties, one or two perhaps of the witnesses testifying that one of Murphy's feet was on the ground and the other on the step of the buggy. The great preponderance of the evidence shows that Murphy reached for appellant's throat, or caught him about the neck. The first attempt was a failure, but the second time he caught him somewhere about the neck or throat. The preponderance of the evidence shows deceased was in the buggy and had hold of appellant about the throat somewhere, some of them saying he had him pushed back with his head over the back of the buggy. The testimony indicates that after he got in the buggy he left it by jumping over the left hind wheel and ran in the house, where he died shortly afterward.

As appellant started away he said to some of those who were present on the gallery or about the front of the house, "Tell Jess to get a gun and come and kill him; that he did not care." Appellant says that when Murphy came to the buggy he reminded him of the fact that "rubber goods" were found in the house and was angry about it. He replied there was nothing wrong about it; that he had never mentioned anything of that sort to the girl in his life; that she was a pure girl, and that he had not bought the rubber goods for that purpose or for the purpose of contaminating the girl, and that she was a lady in every sense of the word. Deceased called him a liar and jumped in the buggy and caught him by the throat and pushed his head back, threatening to kill him; that he jerked his knife out and cut him. One of the wounds was in the hip and the other in the breast, which seems to have penetrated the heart. It seems appellant did not know he had inflicted such a serious wound on deceased until he heard later during the evening that Murphy had died. Appellant testified to a lot of matters, among other things, with reference to deceased getting him by the throat and collar and threatening to kill him, and that he acted in self-defense on a sudden impulse of the moment, and that he had no idea when he went there of having any difficulty with deceased; that his purpose was to go and have an explanation and conversation with him in order to adjust the matters, but the conduct of deceased prevented this; he would not hear him, and brought on the difficulty, which resulted fatally; that he had no purpose or intent of killing him, and did not know he had done so for some hours afterward. The State's theory was that appellant went to the home of deceased for the purpose of doing what he did, and that his story was fabricated and false, and induced the jury evidently to agree with that theory. This is a sufficient statement of the case, in a general way, to bring in review the questions suggested for revision.

During the trial, over protest of appellant, as shown by two bills of exception, the bloody clothing of deceased were permitted to go before and to be examined by the jury. Among other objections, it was stated there was no purpose for which the bloody clothing could be used; there was no question as to the location and character of the wounds, and that the defendant stated that there would be no issue on the question as to the location and character of the wounds. If there was any issue on this question at all, it was on the theory that the wound in the breast was a direct stab and not a "raking" cut. The testimony of the attending physician shows that the wound was, in a general way, a stab with a little cut on the flesh before the knife entered. We are of opinion that under this state of the record the court was in error in permitting the clothing of deceased to go to the jury. This matter has been the subject of a great many decisions. There seems to be a general rule to the effect that unless the bloody clothing would serve to illustrate some purpose with reference to the position of the parties and character of the wound, which was an issue in the case

affirmed on one side and denied on the other, that the admission of the bloody clothing would be error. The cases are collated in Mr. Branch's Annotated Penal Code, on page 1032. See also Cole v. State, 65 S. W. Rep., 530; Melton v. State, 47 Texas Crim. Rep., 451, 83 S. W. Rep., 822; Williams v. State, 61 Texas Crim. Rep., 356, 136 S. W. Rep., 771; Christian v. State, 46 Texas Crim. Rep., 47, 79 S. W. Rep., 562; Lucas v. State, 50 Texas Crim. Rep., 219, 95 S. W. Rep., 1055; Lacoume v. State, 65 Texas Crim. Rep., 146; Corley v. State, 69 Texas Crim. Rep., 626. There was no issue as to the condition or situation of the wounds and their effect. All this was conceded by appellant, proved by the State, and no issue was formed. The theory evidently of the State must have been that defendant's story as to the difficulty testified by himself was a fabrication and invention, and, therefore, this assisted the State in showing that he was prepared for it, and that it was not the striking of a man in self-defense but the deliberate purpose of a man stabbing. None of the witnesses question the fact as to the relation of the parties in any material way; that appellant was in the buggy and deceased attacked him in the buggy, and that appellant was never out of the buggy at any time; that he sat in the buggy during the whole difficulty. The court was in error.

Another bill shows that appellant offered to prove by the witness Williams that he had a conversation with appellant shortly after the difficulty at the house of witness; that the distance between the place of the difficulty and the conversation was something like 700 or 800 yards; that appellant in leaving Murphy's passed directly by Williams' residence, and there the conversation occurred. The court permitted the witness to testify, as he states in his qualification, that defendant was crying, and also as to the appearance and demeanor but not the declaration of the defendant. The conversation offered was admitted by the prosecution, as shown by the bill, to have been somewhere not beyond twelve to twenty minutes after the trouble. The appellant's contention was that it was not so long. Williams would have testified, had he been permitted to do so, as follows: "Yes, I saw the defendant and talked to him when he arrived at my house on his way from Jess Murphy's. He seemed to me to be very sad and was crying when he was talking to me, and he said, 'Jim, I went up there to talk to Jess and reason with him and get my girl,' and he said, 'I called him out and he came out and began to talk,' and he said, 'Cauley, I have some property of yours here,' and he took out his pocketbook, and I said, 'Yes, Jess, that is mine, I don't deny it,' and then Murphy accused me and the girl of doing something we ought not to have done. And Cauley said that he told Jess that that was something of which they were not guilty, and that that was as straight a girl as ever lived so far as he knew, and Cauley said that Jess then called him a liar and got into the buggy and got him by the throat and said, 'I will kill you,' and then Cauley said, 'I would not have done it for nothing in the world, if I had not had to.' And when he made this statement the

tears were rolling down his cheeks. I asked Cauley how he struck him, and he said, 'We just had a little trouble,' and he kept repeating it over, 'We just had a little trouble.' He seemed to be very sad and disturbed at the time he told me this." This was evidently in a very few minutes after it occurred. Appellant drove in his buggy from the place where it occurred to Williams' house and this conversation occurred between them. The State's objection seems to be based upon the idea that it was a self-serving declaration. On the witness stand appellant testified, in substance, if not exactly, to the same account of the trouble that he told Williams; more in detail, however. Another theory of the State evidently was, or must have been, it was not res gestae, and for the two reasons was not res gestae but self-serving, and, therefore, inadmissible. We can not agree with the State in either contention. We are of opinion it was res gestae. The authorities are numerous and so well known it would hardly seem necessary at this late day to collate them; however, a few of them may be collated: Craig v. State, 30 Texas Crim. App., 619. The Craig case has been followed in Clark v. State, 56 Texas Crim. Rep., 293; Wakefield v. State, 50 Texas Crim. Rep., 124; Craven v. State, 49 Texas Crim. Rep., 78; Thomas v. State, 47 Texas Crim. Rep., 534; Gray v. State, 47 Texas Crim. Rep., 375; Freeman v. State, 40 Texas Crim. Rep., 545; Castillo v. State, 31 Texas Crim. Rep., 145; McKinney v. State, 40 Texas Crim. Rep., 372; Ingram v. State, 43 S. W. Rep., 518. These are cases where the declaration of the accused was offered in evidence but rejected. The rule of res gestae is not limited to the State's side of a case. That rule applies wherever there is a call for it, and one side of the case is as much entitled to the benefit of the rule as the other. The criterion is that it is res gestae. Res gestae statements may sometimes operate as self-serving, but if they are res gestae they are still admissible. There is another reason in this particular case why this testimony should have been admitted. The State attacked the defendant's testimony vigorously on the ground that it was fabricated and false, and that he went for the purpose of doing what he did do, to kill Murphy. His testimony was a case of self-defense. Wherever the defendant's testimony is attacked as being fabricated, he may prove in rebuttal prior statements by him corroborating his testimony. Williams' testimony was admissible from that standpoint. See Messer v. State, 43 Texas Crim. Rep., 97. It would be useless to follow this line of discussion further. Williams' testimony, under the circumstances of this case, was admissible.

There is another serious question. The court charged the jury on the law of self-defense generally, and then gave this charge:

"You are charged that the fact that one with a grievance seeks an interview with a man who he believes has wronged him, and in such interview kill or inflicts serious bodily injury upon such person, the act of seeking such interview is not necessarily a provocation nor does

it place such party in the wrong. You are, therefore, charged that the defendant had the right to peaceably go to the house of the deceased for the purpose of having an interview with the deceased, and for the purpose of explaining any differences which may have existed between them at the time. And the fact of his seeking such interview for the purpose of making explanations, does not place the defendant in the wrong and in this connection you are charged that the defendant had the right to make preparation to arm himself for the purposes of defending himself if the deceased assaulted him at such time."

This is the entire charge of the court with reference to this phase of the case. To meet this appellant asked this charge:

"In this case you are instructed that the defendant, Cauley Gillespie, had the right to go to the home of the deceased, either for the purpose of interviewing the deceased concerning the feeling of the deceased toward him or to fulfill the engagement he had with Miss Cynthia Sims, and in this connection you are instructed that if, after the defendant arrived at the home of the deceased and while he was engaged in conversation with the deceased, the deceased went out to the buggy where the defendant was, and climbed into the buggy of the defendant and assaulted him, or assaulted him immediately before climbing into the buggy, and that such assault was an unlawful one, and that at the time of such assault the defendant believed that he was in danger of death or serious bodily harm at the hands of the deceased, and that at said time had a reasonable apprehension for so believing, and that at said time the defendant cut or stabbed the deceased and killed him, then you will acquit the defendant, and say by your verdict not guilty, but in this connection you are instructed that you must view the entire transaction surrounding this homicide and the defendant's presence at the home of the deceased from the standpoint of the defendant."

This charge was refused; it should have been given. This phase of the law was gone over thoroughly in Shannon v. State, 35 Texas Crim. Rep., 2, in a very strong and well considered opinion by this court written by Judge Simkins. So far as the writer is aware that opinion has never been attacked or criticised. That appellant had the right to go to Murphy's and talk with him about the matter and explain to him, ought not to be questioned, whether the Shannon case had ever been written. That he had the right to do so would be but a simple rule of justice and fairness. A man has the right to talk to his adversary, or another party who has charged him with wrongdoing, and explain to him that there was no wrong perpetrated. This ought not to be modified nor minimized when it brings in review a charge of illicit intercourse or fornication with a girl and want of chastity on her part. The deceased had coupled the two together as being guilty of acts of unchastity. The boy was engaged to the girl. His reputation and character and that of the girl both were at issue. He had

a right to talk with deceased, and, in the judgment of the writer, would have been derelict had he not done so. She was soon to become his wife, and in fact within a short time after the homicide did become his wife. He went to deceased to protest against the accusation brought against the woman soon to be his wife and she deceased's sister-in-law, and the fact that he had accused him of taking advantage of the freedom of deceased's home and company of his sister-in-law to debauch and ruin her. This would at least be calculated to disturb the equanimity of the mind of any man who felt he had been wronged in such a matter, and especially under a charge of debauching the girl. His theory of it was, as testified by him, he went to explain to Murphy that there was nothing wrong with the girl; that he had never said anything out of the way to her in his life, and that the "rubber goods" he spoke of were not bought for any such purpose, and that he had had them for some time, and had them in the band of his hat, from where they had fallen without his knowledge; that he bought them in Henrietta, Clay County, when en route to Wichita Falls some time prior to the happening of this matter in the house of deceased.

There is another phase that has not been mentioned that comes into this part of the case. This girl in telling appellant of the condition of things at Murphy's residence and the church about appellant going back to the house, it seems, reached an agreement with him that she was to go to another sister's that evening and he was to call and take her; at least if not that evening shortly, and the evidence is further that she did go later. The court's charge, in a general way, covered a part of this phase of the case, but the court nowhere in the charge informed the jury as to what would be the defendant's attitude in the case if the killing occurred under those circumstances when deceased made the assault. He did tell the jury defendant had the right to arm himself and go *peaceably,* which was rather a stretch of the law with reference to the word "peaceably," but that if he went under those circumstances it would not be a provocation on the part of appellant to bring on the difficulty. Provocation is a limitation of the right of self-defense. If the jury believed he went there, as he contended, under such circumstances he would be entitled to an acquittal. Appellant's special charge applied more nearly the law of the case to the facts shown; at least to defendant's side of it.

There is also a bill of exceptions presented by defendant to the argument of one of State's counsel. The language used is thus recited in the bill: "Gentlemen of the jury, the rivers of blood in Texas running through Texas like the Brazos River and had started in its origin or fountain head like the Brazos River, being red streams of blood coming from the homes where murder had been committed, which had developed into great rivers of blood. And these are the clothes that were worn by the deceased, Jess Murphy, at the time of the fatal stabbing and shows at the time of the fatal stabbing that the life

blood of Jess Murphy was taken while he was in the defense of his home and the girl under his protection, and that the clothing worn by the deceased at the time he was stabbed by defendant showed that the stabbing by the defendant was deliberate, was calculated, and was made directly at the heart of the deceased, and that Jess Murphy's blood was part of the blood that helped to make the rivers of blood in Texas." This was objected to, and appellant requested a special charge, which was refused by the court. This charge requested that the jury be instructed they should not consider this argument. Objection was also made to the argument at the time it occurred. Such sanguinary speeches and statements like those contained in the bill of exceptions should not be indulged. This defendant was not being tried for originating rivers of blood similar to the flow of the waters of the Brazos River through Texas, but he was tried, or supposed to be tried, or ought to have been tried upon the facts developed before the jury. There was no evidence in the case that there were rivers of blood running through Texas like the Brazos River. Upon another trial the prosecuting officers will refrain from comments of this character and argue the case on the facts and the law as given in charge by the court. One of the evils or supposed evils to be cured by the late statute requiring the charges to be read to the jury before argument began was to avoid such speeches and arguments. That statute was intended to confine the arguments upon both sides to the facts in evidence and the law of the case as given by the charge of the court. If the court is wrong in his charge, that matter can be corrected by special charges, and if not given, proper exceptions can be reserved, and the case can come before this court for review, if the trial court refuses the motion for a new trial.

There is another question not pointedly raised perhaps, but indirectly; at least it is in the case, with reference to the meeting of the parties at the time of the difficulty at the buggy. The evidence discloses in part that appellant was only armed with a pocketknife, and that he got the pocketknife out after the difficulty began. There is no conflict in the testimony that appellant only had a pocketknife, and there is a little conflict as to when he got the knife out of his pocket, yet no witness swears to the deadly character of the knife, and the only evidence that it could be of a deadly nature was the fact of the infliction of the wound which caused death. The owner of the knife, who loaned it to appellant to fix his "tugs" some time prior to this difficulty, testified the blade was about two inches or such matter in length, and that he loaned this knife to defendant, as before stated, to fix a "tug" which had gotten loose some way in driving the buggy. Upon another trial the court should instruct the jury with reference to article 1147 of Branch's Annotated Penal Code and following articles, which is article 717 and subsequent articles in the old code. Where the instrument is not itself deadly per se, or calculated to inflict death, a party may be guilty of a less phase of assault. The facts of this case

called for a charge under that statute, and should be given upon another trial.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

HARPER, JUDGE, absent.

PRENDERGAST, PRESIDING JUDGE.—I concur in the reversal because of the admission of the bloody clothes, under the circumstances stated by Judge Davidson.

### ON REHEARING.

#### December 20, 1916.

HARPER, JUDGE.—I was not present when the original opinion was handed down, and as my brethren are unable to agree in the disposition of the motion for a rehearing, I have taken the record and studied it carefully and thoughtfully.

I agree that the clothing was inadmissible. When the physician described the location, nature and character of the wound, no question was raised by appellant that he correctly presented the matter. Appellant introduced no testimony to vary the State's testimony on this issue, and the testimony of the State was clear and unequivocal. Therefore, the clothing was not necessary to show the nature or character of the wound, nor the relative position of the parties at the time the fatal wound was inflicted. I, therefore, agree with Judge Davidson in holding that the bloody clothing was inadmissible.

I also agree with Judge Davidson in holding that the conversation had with the witness Williams was admissible under the res gestae rule that has long been in force in this State.

On the other questions discussed by Judge Davidson, I do not agree with him. The court refused the bills in regard to argument of counsel; therefore, these matters are not properly verified and would present no error. As the charge on self-defense was full and fair, and no limitation placed thereon in any respect, there was no error in refusing the special charge requested. Williford v. State, 38 Texas Crim. Rep., 393; Harrelson v. State, 69 Texas Crim. Rep., 588; Fox v. State, 71 Texas Crim. Rep., 318.

On account of the matters first herein referred to, I join in the order overruling the motion for rehearing.

*Overruled.*

PRENDERGAST, PRESIDING JUDGE (dissenting).—I have studied this record, and am now convinced the clothing was admissible, and that appellant's statement to Williams was self-serving and not res gestae, and not admissible on any ground. The judgment should be affirmed, not reversed.