INTOXICATING LIQUORS ⬤═236(11) — SALE OF NONINTOXICATING MALT LIQUORS — EVIDENCE.

In a prosecution under Pen. Code 1911, arts. 157–160, for engaging in the business of selling nonintoxicating malt liquors without payment of taxes, evidence *held* insufficient to sustain a conviction, it failing to show that the liquid labeled "Teddy Beer" was a nonintoxicating liquor, and that defendant was engaged in the business of selling the same at any time fixed by the evidence.

Appeal from Young County Court; W. P. Stinson, Judge.

Ed. Cheves was convicted of engaging in the business of selling nonintoxicating malt liquors without payment of taxes, and appeals. Reversed and remanded.

E. B. Hendricks, Asst. Atty. Gen., for the State.

MORROW, J. Appellant was convicted of engaging in the business of selling nonintoxicating malt liquors without payment of taxes.

The prosecution was under chapter 7, P. C. It appears that appellant conducted a cold-drink business in Young county, and that the sale of intoxicating liquors was prohibited by law, and that appellant had not paid any taxes for the selling of nonintoxicating malt liquors. The state's witnesses were the sheriff of the county, the constable of the precinct, and the city marshal of the town in which appellant conducted his business.

The sheriff testified that he had obtained from appellant two bottles labeled "Teddy Beer," which were introduced in evidence; that these bottles were not purchased, but were taken from a barrel probably two-thirds full of like bottles; that there were other barrels in appellant's place of business, but witness did not know what they contained; that he did not drink any of the liquid, and had no knowledge as to whether it was intoxicating or nonintoxicating; that it was not taken from the ice box from which appellant was selling drinks to his trade; that he had on several occasions seen the appellant sell drinks which he thought bore the same label "Teddy Beer," but was uncertain as to that, and that he was unable to state when any of the sales were made.

The constable stated that appellant sold stuff that looked like beer, Coca-Cola, cider, soda water and mackeral; that he drank in the course of three months three bottles of stuff that looked like beer and tasted like beer; that he did not buy it; that appellant gave it to him; that he had drunk beer in similar quantities; and that neither the stuff bought from appellant nor the beer which he had bought from other sources produced intoxication; that he had seen him sell similar stuff to that which he gave the witness, but had no recollection as to when the sales were made. He also stated that he would not say whether the liquid which appellant gave him and which he drank was intoxicating or nonintoxicating.

The city marshal testified that he had never drunk any of the "Teddy Beer," and had never seen appellant sell it; that appellant had several barrels in his place of business, but he did not know what they contained.

This evidence, we think, is insufficient to sustain conviction. It fails to show that the liquid labeled "Teddy Beer" was a nonintoxicating malt liquor, and fails to show that he was engaged in the business of selling said liquor at any time definitely fixed by the evidence.

The judgment of the lower court is reversed, and the cause remanded.

---

TIGER v. STATE. (No. 4486.)

(Court of Criminal Appeals of Texas. Oct. 3, 1917.)

1. HOMICIDE ⬤═250 — EVIDENCE — SUFFICIENCY.

Evidence *held* sufficient to sustain a conviction of murder.

2. HOMICIDE ⬤═282½—QUESTIONS FOR JURY —PENALTY.

In a prosecution for murder, fixing the penalty was a matter for the jury, the Supreme Court having no power or authority to fix the penalty.

Appeal from District Court, Matagorda County; Sam'l. J. Styles, Judge.

John Tiger was convicted of murder, and appeals. Affirmed.

E. B. Hendricks, Asst. Atty. Gen., for the State.

PRENDERGAST, J. This appeal is from a conviction of murder with the death penalty assessed.

Besides appellant there were but two eyewitnesses to the killing, Will Carter and Mamie Chappel. Appellant did not testify. Mamie Chappel, by her own testimony, had been the "kept" woman of appellant for a long time, and until shortly before the killing. The killing occurred in her house. The deceased, Claude Hughes, was a white man;

the appellant, a negro. The deceased was killed by being shot. Four bullets struck him. One entered the front of his neck, a little to the right of the center, and went entirely through, striking and imbedding itself in the door facing. This shot powder burned his chin, and in entering made a little crease, just under his chin. This ball angled up and came out a little to the left of where it went in. Another bullet went in his side under his right armpit, above the elbow, 3½ or 4 inches from the shoulder. That ball stopped in his body—did not pass through him. Another shot struck him on the nose, a little to the right side, passed down through his nose, but did not elsewhere touch his face or clothing. The other shot struck him just above the eye, and passed back of his eye down and struck and broke his jaw, knocking out one of his teeth. This was a steel bullet, one of the witnesses who particularly examined, testified, and was picked up right in front of deceased's mouth, and had a piece of bone or tooth and blood on it.

An accurate plat and measurement was made of the room, the doors and various pieces of furniture in the room where the killing occurred, and where the parties were, and where the deceased was standing when first shot or shot at, and where he was when he fell and died. All the witnesses who testified to any of these facts did so with reference to this plat and measurement, pointing out particularly the different places and things from it. It was introduced in evidence, but it is not in the record. Without this there is some difficulty in locating these several things by the testimony alone, as is always the case when a statement of facts shows witnesses testified from a plat.

The house had two rooms in it. It fronted east with a gallery extending almost the whole length. A partition separated the room, in which the killing occurred, from the other room, with a door therein near the center swinging into the south room towards the east wall. The right-hand side of the door into the south room from the gallery hung 1 foot and 4 inches from the partition wall, the two doors swinging back toward one another. Behind the door in the partition wall was a trunk, which was against the partition wall and so situated that the door in the partition wall would open only at about right angles, the trunk preventing it being further opened. A bed was in one corner, the foot extending towards the center of the room.

Will Carter testified that he, deceased, and two young white men, Clyde and Ewell Koontz, were in Mamie Chappel's house with her an hour or two before the killing, staying about a half hour, then all left. Clyde Koontz also so testified. The killing occurred between 12 and 1 o'clock at night, or later. Will Carter also testified that he and deceased just before the killing, but not to-gether, approached said house from different directions, neither knowing of the other's approach until right at the house. He swore that just as he approached the house he heard some loud talking in there. Carter further testified:

"When I got there Mr. Claude Hughes stepped up there just in front of me, on the gallery at Mamie Chappel's house, and he went right inside the door. When Mr. Hughes got there the door was closed, and he opened it, and I saw him go in, and when he went in I was about as far from him as from here to that stove (indicating about 10 feet); he did not know that I was behind him until he looked back and saw me just as he went in the house. He didn't do anything when he went in the door; he looked back and saw me just as he stepped inside, and he said, 'Hello, hello; what is the trouble?' When Mr. Hughes stepped in the door he stopped right at the side of the door, right close to the facing, and when I went in I went right by him, in front; that door opened to the inside, and I opened the door and passed right by Mr. Hughes and by Mamie, and just to the left side of him. * * * When I went in John Tiger, the defendant, was sitting right behind the door that you go in, which door pushed back practically against him, and he was sitting on a trunk right there. Besides the door that I went in there was another door in that room in the partition wall leading into the other room, and the trunk that the defendant was sitting on at that time was right between those two doors; and the shutters to both of those doors opened back against the trunk. At the time of this shooting the door that led into this room was open as far as it could get—it couldn't get way open, but it stood just about like that, half open; it couldn't get way open on account of the trunk, the door going back against the trunk; and when the other door was opened the defendant was sitting on the trunk right between the doors. Yes, sir; I went in the room and passed by Mr. Hughes and stepped over to the other side of the room. When I stepped in there Mr. Hughes didn't do anything at all. When he stepped up there, when they said 'Come in,' he shoved the door open and went in, and he said: 'Hello, hello; what is the trouble?' and Mamie went to tell him, and said something out of the way that this fellow here said to her; when Mamie went to tell Mr. Hughes what the trouble was, after he had said, 'Hello, hello; what was the trouble'—she said, 'This nigger told me' something, you know, out of the way,' and then he said (indicating the defendant), 'Why, is you the law?' Johnnie Tiger said: 'Why, is you the law?' John Tiger was still sitting on the trunk at that time. When John Tiger said, 'Why, is you the law?' Mr. Hughes said, 'No; I ain't the law;' and John Tiger then said, 'You must be the law;' and Mr. Hughes said, 'No; I ain't the law;' and then John Tiger said, 'What you looking for, trouble?' and Mr. Hughes said: 'No; I ain't looking for trouble,' and said, 'No; I just know Mamie;' and then Johnnie got up off that trunk and goes into the other room. When Mr. Hughes had this conversation with John Tiger Mr. Hughes was standing up right by the door, at which time he didn't have a thing in his hands. Johnnie said, 'Huh,' and got up and went into the other room, and Mr. Hughes had the tobacco in his hands like this (indicating as though rolling a cigarette): He was standing up like this, and went to roll a cigarette, and that time Johnnie came back in, just as he pulled his tobacco out, and Johnnie came right to the foot of the bed— the bed sat right even with the door facing— and he got right to the foot of the bed, and had on an overcoat and had both hands in his pocket, like this, and he was right in front of

Mr. Claude, just like this, and he said, 'You must be looking for trouble,' and Mr. Claude had his head down rolling a cigarette, and Johnnie said, 'You must be looking for trouble,' and Mr. Claude said, 'No; I ain't looking for trouble;' and he said, 'You must be,' and that time Johnnie said: 'You God damn ———.' That is all I could understand, and Johnnie went to shooting, bow-bow, and backed up into the room, but not toward me—I was standing on the other side—and he backed right up into that room, and when he backed into that room, and when the first shot was made, Mr. Claude just fell like that, and he kept falling, and John Tiger just kept backing up shooting, and when Mr. Claude fell he stepped out of the other room, and stepped right over him, and I heard it go 'clatter, clatter, clatter,' and the baby hollered in the other room, and Mamie hollered: 'Oh, don't shoot my child!' and when she said that the baby came running out over Mr. Claude and ran right to Mamie, and Mamie grabbed her and ran right out the door, she and Johnnie and the baby, and I came out from under the bed, right on my knees."

The officers were called just after the shooting. They, with others, went where the deceased was killed, and then, and also later, made an examination of deceased and the wounds on him, and found in the walls of the house where the balls fired by appellant entered it. All of the physical facts testified to by various disinterested witnesses corroborated Carter's testimony of the shooting and killing. Appellant left that night, and was not apprehended until the following Monday morning early. The pistol with which he did the shooting was then found on his person, and was shown to have been discharged recently so as to correspond with the shooting Saturday night or Sunday morning. It was a large bore pistol. It shot leaden bullets, not steel. All of the wounds on deceased unless it was one in the face, were shown to have been inflicted on deceased by leaden bullets. After the killing, when the officers and others examined deceased, the house, etc., a pistol was found lying in the room in which appellant backed just before he began shooting deceased, and also after he began shooting. How this pistol got there is not explained by the testimony. It was shown to have been the pistol of deceased.

[1, 2] Appellant received no wound, and his clothing even was not shown to have been struck by any bullet. Mamie Chappel, a negro woman, appellant's formerly "kept" woman, testified in his behalf, and if her testimony had been believed, she might have made a case of self-defense for appellant. She testified, in substance, that immediately when the deceased stepped in the door he, without any provocation whatever, had a pistol in his hand, and began shooting at appellant. All the physical facts, including where the bullets struck, dispute her directly. The court submitted self-defense based on her testimony, and told the jury in substance to acquit him if they believed the state of facts testified to by her. The jury could not have believed her under the testi-mony, and should not have done so. It is unnecessary to detail her testimony. The state's case, without doubt, made a clear case of murder against appellant. The testimony of said negro woman, as stated, might have made a case of self-defense in his behalf if the jury had believed it. After a careful and repeated study of the testimony, we think it clear and ample to sustain the verdict. The penalty was a matter for the jury to assess. This court has no power or authority to fix a penalty.

The testimony of Bert Carr, which was objected to by appellant, shown by his only bill, was admissible on two grounds: First, it was in effect an impeachment of appellant's witness said Mamie Chappel; second, it was a res gestæ statement made by her. His bill objecting to the admission of this testimony presents no error. Gillespie v. State, 190 S. W. 146. These are the only questions presented.

The judgment is affirmed.

---

## SESSIONS v. STATE. (No. 4408.)

(Court of Criminal Appeals of Texas.  June 6, 1917.  Dissenting Opinion, July 18, 1917. Concurring Opinion, Oct. 13, 1917.)

1. CRIMINAL LAW ⬤⟲951(1)—NEW TRIAL—MOTION—WHEN TO BE FILED.

While under Code Cr. Proc. 1911, art. 839, the court is given discretion in felony cases to hear a motion for new trial after two days, in misdemeanor cases the motion must be filed within two days of conviction.

2. CRIMINAL LAW ⬤⟲1129(1)—APPEAL—ASSIGNMENTS OF ERROR.

Rev. St. 1911, art. 1612, relating to assignments of error, pertains to civil cases only.

3. CRIMINAL LAW ⬤⟲1063(1), 1129(1) — REVIEW—ASSIGNMENTS OF ERROR—NECESSITY.

Court rule 101a (159 S. W. xi), relating to assignments of error and motion for new trial, does not control the authority of the court to pass upon questions disclosed in the record on appeal.

4. COURTS ⬤⟲78—COURT RULES—STATUTE.

Court rule 101a, if intended to prevent review of record because there was no motion for a new trial, would be inconsistent with legislative enactment, and hence beyond the power of the Supreme Court, the procedure for criminal appeals being prescribed by statute.

5. CRIMINAL LAW ⬤⟲1063(1)—APPEAL—MOTION FOR NEW TRIAL—NECESSITY.

Vernon's Ann. Code Cr. Proc. 1916, arts. 744, 844, relative to bills of exceptions and statements of facts, and other statutes providing the requisites of bills of exceptions and statements of facts, constitute the statutory means in criminal cases for bringing questions before the appellate court for review, and a motion for a new trial is unnecessary, except as to questions not raised by bills of exceptions or statement of facts.

6. CRIMINAL LAW ⬤⟲778(5)—INSTRUCTIONS—REASONABLE DOUBT—BURDEN OF PROOF.

In a prosecution for carrying concealed weapons, an instruction, "If you believe from the evidence beyond a reasonable doubt that the defendant had on his person a pistol, as charged, but that he was on his own premises and not in the street, then the defendant would be guilty of no offense," was erroneous, in that